LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (CA Bar No. 266966)
eburbidge@lewisllewellyn.com
Rebecca Furman (CA Bar No. 294082)
bfurman@lewisllewellyn.com
Kenneth M. Walczak (CA Bar No. 247389)
kwalczak@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile: (415) 390-2127

COUNCILL, GUNNEMANN & CHALLY, LLC
Jonathan R. Chally (GA Bar No.141392); *Pro Hac Vice*
jchally@cgc-law.com
1201 W. Peachtree Street NW, Suite 2613
Atlanta, Georgia 30309
Telephone: (404) 407-5250
Facsimile: (404) 600-1624

Attorneys for Plaintiff
ECHOSPAN, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECHOSPAN, INC.,<br><br>   Plaintiff/Counter-Defendant,<br><br> v.<br><br>MEDALLIA, INC.,<br><br>   Defendant/Counter-Plaintiff. | Case No. 5:22-cv-01732-NC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S ECHOSPAN, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 23, 2023<br>Time: 11:00 a.m.<br>Ctrm: 5 – 4th Floor<br>Judge: Hon. Nathanael Cousins |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 5

FACTUAL AND PROCEDURAL HISTORY ...................................................................... 5

    A.    Echospan Develops and Sells a Proprietary 360-Degree Employee Review System. ......... 5

    B.    EchoSpan's 360 System Is Confidential and a Trade Secret. .............................................. 6

    C.    Seeking to Enter the 360-Degree Review Market, Medallia Accessed a Free Trial of EchoSpan's Software System and Agreed to its Terms and Conditions. .......................... 6

    D.    Medallia Breached the Terms and Conditions in its use of EchoSpan's 360 System. ....... 10

    E.    EchoSpan Files This Lawsuit. .............................................................................................. 11

STANDARD OF REVIEW .................................................................................................... 12

ARGUMENT AND AUTHORITY ........................................................................................ 12

MEDALLIA ACCEPTED ECHOSPAN'S TERMS AND CONDITIONS. .................................. 13

    A.    Medallia Accepted the Terms and Conditions by a "Clickwrap" Agreement, a Valid Form of Assent. ........................................................................................................................ 13

    B.    The Acceptance of the Terms and Conditions Binds Medallia. ........................................ 13

MEDALLIA BREACHED ECHOSPAN'S TERMS AND CONDITIONS................................... 16

THE ██████████████████████████████████ MEDALLIA'S ACCEPTANCE OF THE TERMS AND CONDITIONS.............................................................. 17

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 12

*Atlanta Integrity Mortg., Inc. v. Ben Hill United Methodist Church*,
   650 S.E.2d 359 (Ga. Ct. App. 2007) ........................................................................ 18

*Celotex Corp. v. Cattrett*,
   477 U.S. 317 (1986) ................................................................................................ 12

*First Fin. Bank, N.A. v. Bauknecht*,
   71 F. Supp. 3d 819 (C.D. Ill. 2014) ......................................................................... 12

*Freeman v. Arpaio*,
   125 F.3d 732 (9th Cir.1997) .................................................................................... 12

*Holliday Const. Co. v. Sandy Springs Assocs., Inc.*,
   400 S.E.2d 380 (Ga. Ct. App. 1990) ........................................................................ 15

*Jenks v. DLA Piper Rudnick Gray Cary US LLP*,
   196 Cal. Rptr. 3d 237 .............................................................................................. 17

*Keenan v. Allan*,
   91 F.3d 1275 (9th Cir.1996) .................................................................................... 12

*Landcastle Acquisition Corp. v. Renasant Bank*,
   57 F.4th 1203 (11th Cir. 2023) ................................................................................ 15

*Morris v. Williams*,
   448 S.E.2d 267 (Ga. Ct. App. 1994) ........................................................................ 15

*O'Brien as Tr. of Raymond F. O'Brien Revocable Tr. v. XPO CNW, Inc.*,
   362 F. Supp. 3d 778 (N.D. Cal. 2018) ..................................................................... 17

*Rahim v. Chime Fin., Inc.*,
   2022 WL 18459836 (N.D. Ga. Nov. 14, 2022) ....................................................... 13

*Richards v. Combined Ins. Co.*,
   55 F .3d 247 (7th Cir.1995) ..................................................................................... 12

*Snapp v. United Transportation Union*,
   889 F.3d 1088 (9th Cir. 2018) ................................................................................. 18

*Stamey Cattle Co., LLP v. Wright*,
   2019 WL 722597 (S.D. Ga. Feb. 19, 2019) ............................................................. 12

*Stone v. Shafran,*
    2022 WL 18780499 (S.D. Fla. Nov. 21, 2022) ................................................................. 15

*Thornton v. Uber Techs., Inc.,*
    858 S.E.2d 255 (Ga. App. 2021) ..................................................................................... 13

*Williams v. Columbia Debt Recovery, LLC,*
    579 F. Supp. 3d 1203 (W.D. Wash. 2022) ...................................................................... 12

**STATUTES**

Georgia
    O.C.G.A. 10.6.1 ......................................................................................................... 14, 15

**FEDERAL RULES**

Federal Rules of Civil Procedure
    Rule 56(c) ........................................................................................................................ 12

**INTRODUCTION**

There is no factual dispute that Defendant Medallia, Inc. ("Medallia") breached its contract with Plaintiff EchoSpan, Inc. ("EchoSpan"). Medallia agreed to EchoSpan's Terms and Conditions when it signed up for a free trial of EchoSpan's 360 System. Medallia agreed that that its trial access was to evaluate EchoSpan's 360 System for purchase. It agreed that it would respect the confidential information within EchoSpan's 360 System. It agreed not to commercially exploit its access to the system. And it agreed that it would not use its access to build a competing tool. Medallia breached each and every one of those terms. As its employees testified, Medallia had no interest in purchasing EchoSpan's 360 System and was instead using Medallia's trial access to glean as much information as possible to build its competing 360 system. These undisputed facts establish Medallia's breach of the Terms and Conditions.

Summary judgment is therefore warranted on EchoSpan's claim for breach of contract. The Court should enter judgment in EchoSpan's favor on that claim, narrowing the issues remaining for trial.

**FACTUAL AND PROCEDURAL HISTORY**

**A.   Echospan Develops and Sells a Proprietary 360-Degree Employee Review System.**

EchoSpan is a software company. Over the last fifteen years, it has developed a sophisticated, organizational, 360-degree review platform. *See* https://www.echospan.com/360-degree-feedback.asp (last visited July 8, 2023). A 360-degree review is a multi-directional performance evaluation and talent development tool that gathers feedback on an individual's performance from more than just one manager. It can include performance reviews by others who interact with the individual regularly, including peers, direct reports, and other superiors. *E.g.*, https://www.uschamber.com/co/run/human-resources/360-performance-reviews (last visited July 17, 2023); Ex. A, Myers Supp. Report at 48 n.4. Due to their ability to provide a holistic perspective on employee strengths and improvement areas, 360 reviews are becoming increasingly popular . https://www.aihr.com/blog/360-degree-feedback/ (last visited July 17, 2023).

Joe Vance founded EchoSpan in 2007 and serves as the company's CEO and sole owner. Ex. B, 27:11-12, 15-16, 32:5-8. Mr. Vance developed the company's 360-degree review software system (it's "360 System") over fifteen years and through thousands of hours of work. *Id.* at 22:2-3, 293:22-294:14. Mr. Vance built EchoSpan into a leading provider of 360 review systems, which it provides to multiple multinational corporations. *Id.* at 39:4-24. EchoSpan's sole product offering is this system, which it provides in a standard configuration or with particular tailoring. *See* https://www.echospan.com/360-degree-feedback.asp. EchoSpan's clients include large and complex organizations that simultaneously manage separate, but simultaneous, reviews of thousands of employees. Ex. B, 35:21-36:2.

### B. EchoSpan's 360 System Is Confidential and a Trade Secret.

EchoSpan treats the entirety of its 360 System as a trade secret. Accordingly, the company goes to substantial lengths to protect the confidentiality of both the 360 System itself, as well as each of its functional aspects. EchoSpan employees, consultants, and vendors with access to the 360 System are bound by confidentiality obligations that require the employee or vendor to hold all confidential information and trade secrets in strict confidence and use the same only in performance of their duties. Ex. D; Ex. E; Ex. B, 260:8-18, 295:23-296:4, 296:12-17; Ex. F at 7. Only those EchoSpan employees with a need to access the 360 System receive access. Ex. B, 31:18-23. EchoSpan routinely trains its employees on security awareness, requires that they each pass a background check, and enforces a data classification and handling policy. *Id.*, 296:12-17, 298:3-12. EchoSpan clients similarly are required to accept the confidentiality obligations contained in EchoSpan's Terms & Conditions (or individually negotiated confidentiality terms that protect the secrecy of EchoSpan's proprietary and trade secret information). *Id.* at 40:7-21; Ex. C.

### C. Seeking to Enter the 360-Degree Review Market, Medallia Accessed a Free Trial of EchoSpan's Software System and Agreed to its Terms and Conditions.

Medallia is also a software company, but its historical focus was much different than EchoSpan's. Ex. H, 88:16-21. Medallia is focused on "customer experience," which means reviewing *customers* (not employees, like EchoSpan) to determine *customer* satisfaction with *customer* interactions. *Id.* Until their interaction with EchoSpan, Medallia did not have a workable

1  system to facilitate 360 reviews of *employees*.

2  Indeed, as of 2019, Medallia did not have any 360 employee experience system at all.  Ex. I,
3  34:8-12 ("[W]hen [I] left Medallia in May of 2021, the 360-Degree survey tool. . . wasn't even
4  started"); Ex. J, 39:17-21 ("Q:[In] September or October of 2020, Medallia did not have a product
5  with 360 review functionality, right? A: That's correct.").
6  
7  
8  . Ex. H, 124:22-125:11, 125:14-126:4.
9  At Medallia,
10  
11  . Ex. K, 17:3-16.
12  Although                                                                      Ex. K, 92:22-
13  93:14, in
14  .[1]  Ex. L.
15  
16  Exhibit M; Ex. K, 92:9-14. Medallia
17  
18  . Ex. N.

19  Medallia, however, did not have a 360 system at that time.  Its product designers did not understand
20  the requirements of a 360 system, or how such requirements would function as part of a complex
21  tool.  Ex. I, 112:16-19, 113:10-11, 121:19-122:7.  Without this understanding, Medallia could not
22  design or build a 360 system.  *Id.*  Medallia's director of product management, who was responsible
23  for product design of the company's 360 review tool and also engaged in detailed exploration of
24  EchoSpan's 360 System, testified that she "did not have experience in 360 product at all, so [she]
25  did not understand their requirements or how it had to be built or any of that."  *Id.* at 113:6-12.  This

---

[1] Medallia was also tasked with creating a performance management tool for this customer.  Ex. K, 44:8-15.  A performance management tool is an employee review tool that has unidirectional capabilities, like a traditional employee review.  EchoSpan also provided this capability to its former customer.  Ex. B, 470:6-17; 471:22-472:8.

1  product manager, in charge of creating Medallia's 360 System, could not even describe what a
2  performance management tool *was*, much less determine how to build one. *Id.* at 27:2-28:11 ("Q:
3  Can you just in layman's terms tell me what performance management tool Medallia was building. .
4  . A: I didn't have a good understanding of it.") 78:1-2 ███████████████ Other product
5  managers testified similarly. Ex. O, 76:6-24 (describing that he was researching "what does a good
6  performance review look like. . . what are good questions to ask").

7        Accordingly, just six days later, on January 13, 2021, the director of product management in
8  charge of creating Medallia's 360 system—Pallavi Kapnadak—signed ███████████████
9  ███████████████. Ex. P; Ex. I, 97:18-20. She signed up for this access to "understand the
10 functionalities or the features of a 360 platform." *Id.* at 112:16-19, 113:6-9, 119:9-20
11 ("[U]nderstand[ing] the requirements . . . required creating a trial with EchoSpan."); 143:3-9 ("The
12 reason [I] set up trial access to the EchoSpan tool was to gain an understanding of the functionality
13 of the tool."); 148:3-149:1; Ex. O, 73:8-74:10 (accessing EchoSpan's 360 System was "part of our
14 internal education" on 360 reviews) (cleaned up). And she did so at the express direction of her
15 superior, Medallia's Vice President of Product Management. Ex. I, 113:6-114:3, 11-13; 115:11-
16 116:6 (describing direction to "go ahead and create a trial account"), 117:16-22, 121:9-18; Ex. Q
17 (███████████████████████████████████████████
18 ███████████████████████████).

19       To sign up for this access, the product manager requested a trial on EchoSpan's webpage.
20 *See* Ex. G. Once that request was submitted, the product manager received an email with an
21 individualized link to a trial access form to create her account for EchoSpan's trial; she had to
22 complete this form and click a button which states "Create My Account." Ex. B, 81:18-82:15; Ex.
23 R. And, just above pressing the button to "create [her] account" for the free trial, the product
24 manager had to check the box and agree to EchoSpan's Terms and Conditions (EchoSpan's "Terms
25 and Conditions"):

☐ I have read and agree to EchoSpan's Terms and Conditions and Privacy Policy.
(EchoSpan will never sell or give your personal data to anyone and will not send you spam.)

CREATE MY ACCOUNT

Ex. B, 81:18-82:15; Ex. R. To finalize her account access, the director of product management also had disclose the reason she was evaluating Echospan's 360 System; she disclosed that she was evaluating EchoSpan's 360 System for "[i]nternal use with employees of my company or organization." Ex. R; Ex. B, 81:13-82:15.

This director of product management also created administrative access for others on the product management team for this project. Ex. J, 153:13-19; Ex. S, (███); Ex. T, ███ (███); Ex. U (███). Each of these users accepted EchoSpan's Terms and Conditions each time they accessed their accounts. Ex. B, 45:14-25; Ex. O, 82:7-15 (acknowledging acceptance of Terms and Conditions); Ex. V.

Those Terms and Conditions bind Medallia and limit how it may use its trial access to EchoSpan's 360 System. Among other things, in signing up for a trial account, Medallia agreed:

- That its "[f]ree trial account [would] be used only for the purpose of evaluation of the [360 System] for purchase by [Medallia]," Section 3.g;
- That "EchoSpan retains all ownership rights in the EchoSpan [360 System]" . . . and Medallia "may not. . . distribute or commercially exploit the content," Section 4.d;
- That "EchoSpan retains ownership and all rights to EchoSpan. . . trade secrets," Section 5;
- That "EchoSpan's 'Confidential Information' means all confidential and proprietary information of EchoSpan disclosed to [Medallia],. . . that . . . reasonably should be understood to be confidential . . . including, without limitation. . . technology and technical information [and] product designs," that Medallia would not "use or disclose any Confidential Information. . . for any purpose

outside the scope of [EchoSpan's 360 System]," and that Medallia shall "shall protect the confidentiality of [EchoSpan's] Confidential Information in the same manner that it protects the confidentiality of its own confidential information of like kind,"  Section 12.a, c;

- That it would "use the [360 System] in compliance with applicable law and not. . . make [the 360 System] available to any third party," Section 19.b; and

- That it "agree[d] not to modify, copy or create derivative works based on the [360 System], reverse engineer the [360 System, or] access the [360 System] for the purpose of building a competitive product or service or copying its features or user interface."

Ex. W; *also available at* https://www.echospan.com/terms.asp (last visited July 17, 2023).

### D. Medallia Breached the Terms and Conditions in its use of EchoSpan's 360 System.

After Medallia's employees agreed to EchoSpan's Terms and Conditions, in direct violation of those terms, they repeatedly accessed EchoSpan's 360 System for extended periods of time to copy, analyze and extract key metrics from EchoSpan's 360 System to build their competing system.. Ex. X; Ex. B, 457:12-15. Indeed, during their ***eighty-six*** times accessing the system, Ex. X, they used it to:

- Gain an understanding of the functionality of the 360 System and "how it worked," including by creating projects and adding raters within EchoSpan's 360 System, Ex. J, 159:18-22-160:18;

- ███████████████████████, Exs. Y, Z;

- ████████████████████████████████████, Ex. AA, Ex.BB, Ex. CC, Ex. DD at 3, Ex. EE at 27-29;

- ████████████████████████████████████████████████████████████████████████████████████████████████████████, Ex. FF; Ex. O, 109:4-20;

- ████████████████████████████████████████████ Ex. FF;

- ███████████████████████████████████████████, Ex. GG at 24-27;
- ███████████████████████████████ Ex. HH at 4;
- ███████████████████████████████ Ex. II; Ex. JJ at 11 ████████ Ex. KK ███████); Ex. LL ████████████████████████
- ███████████████████████████████, Ex. MM; and
- ███████████████████████████████, Ex. NN ████████████████████"), Ex. OO at 2-4 ████████████████████).[2]

### E. EchoSpan Files This Lawsuit.

Upon learning that Medallia built a competing tool and usurped its largest customer following its trial use of EchoSpan's 360 System, EchoSpan brought this lawsuit. Dkt. 1-1. It was originally brought in Georgia state court, but later removed to federal court and subsequently transferred to the Northern District of California. Dkts. 1, 60. Medallia moved to partially dismiss the Complaint, which was granted in part. The remaining claims in this action against Medallia are Count I for breach of contract and Counts VIII and X for violation of the Defend Trade Secrets Act ("DTSA") and the Georgia Trade Secrets Act ("GTSA"). Dkt. 114. EchoSpan moves for summary

---

[2] ██████████████████████████████████ Ex. PP at 4 ██████████████████████

As a result, Medallia ████████████████████ Ex. QQ at 1 ████████ Ex. RR ████████ As part of ████████, and unrelated to Medallia's trial use of EchoSpan's 360 System, ████████████████. Ex. SS.

judgment only as to liability for Count I for breach of contract.

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (*quoting Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).

## ARGUMENT AND AUTHORITY

For its breach of contract claim under Georgia law,[3] EchoSpan must show: (1) a valid contract; (2) breach of its terms; and (3) damages arising from that breach. *Stamey Cattle Co., LLP v. Wright*, No. 5:17-CV-147, 2019 WL 722597, at *7 (S.D. Ga. Feb. 19, 2019). Because there is no disputed issue of material fact that: (1) Medallia accepted and was bound by EchoSpan's Terms and Conditions; (2) Medallia breached those Terms and Conditions; and (3) EchoSpan suffered damages as a result, EchoSpan is entitled to summary judgment in its favor on Count I for breach of contract.[4]

---

[3] Georgia law applies to the interpretation of the Terms and Conditions and Medallia's breach thereof. Ex. W, Section 1.

[4] While damages indisputably flowed from Medallia's wrongdoing, a genuine issue of material fact exists as to the amount damages that EchoSpan is entitled to for Medallia's breach of contract. Accordingly, the issue of damages should be reserved for the jury, and EchoSpan moves as to

# MEDALLIA ACCEPTED ECHOSPAN'S TERMS AND CONDITIONS.

### A. Medallia Accepted the Terms and Conditions by a "Clickwrap" Agreement, a Valid Form of Assent.

There is no dispute that Medallia agreed to be bound by EchoSpan's Terms and Conditions. When Medallia's director of product management obtained a trial account for the company to access EchoSpan's 360 System, the "Create My Account" button sat directly beneath a conspicuous click box that states, "I agree to EchoSpan's . . . Terms of Service." *See* Ex. R.

Potential users—including Medallia—are unable to create trial access accounts before clicking the box to accept the Terms and Conditions. *See, infra*, p. 5. These types of "clickwrap" assent to terms and conditions are broadly accepted. *Rahim v. Chime Fin., Inc.*, No. 1:22-CV-03209-WMR, 2022 WL 18459836, at *2 (N.D. Ga. Nov. 14, 2022) (enforcing clickwrap agreement); *Thornton v. Uber Techs., Inc.,* 858 S.E.2d 255, 258 (Ga. App. 2021), *reconsideration denied* (June 16, 2021), *cert. denied* (Oct. 5, 2021) (same); *see also NCR Corp. v. Manno*, 2012 WL 12888663, at *5 (N.D. Ga. Oct. 26, 2012) (agreement contained within hyperlink is enforceable and not unconscionable when prominently displayed).

Every EchoSpan user also consents to the Terms and Conditions with each login, which is binding under Georgia law. Ex. V; *see Thornton*, 858 S.E.2d at 258 (affirming that user accepted terms and conditions indicated and hyperlinked at bottom of screen by singing into service). Accordingly, Medallia accepted and agreed to be bound by EchoSpan's Terms and Conditions.

### B. The Acceptance of the Terms and Conditions Binds Medallia.

There is also no genuine dispute of material fact that the acceptance of these Terms and Conditions was made on behalf of, and bound, Medallia. Discovery has proven that the director of product management who performed the sign up for the EchoSpan trial was given *actual* authority to access EchoSpan's 360 System by two vice presidents, including her direct superior, and a senior

---

liability only. *See Williams v. Columbia Debt Recovery, LLC*, 579 F. Supp. 3d 1203, 1211 (W.D. Wash. 2022)(approving of procedural mechanism of filing summary judgment on the issue of liability only); *First Fin. Bank, N.A. v. Bauknecht,* 71 F. Supp. 3d 819, 837 (C.D. Ill. 2014) (granting summary judgment as to liability though "[t]here is a genuine issue of material facts as to damages that a jury must resolve.").

1  vice president then at Medallia. She was directed to access the system by her boss, and on behalf of
2  Medallia. This is actual authority.
3      This director of product management testified that she was acting on behalf of Medallia
4  when signed up for trial access. Ex. I, 58:5-20. 124:1-13 ("I didn't want to use it for my personal
5  benefit anyway. It was just something I was doing for the company that I was working at."), Ex. O,
6  83:15-84:18 ("I did not have an independent interest [in EchoSpan's tool]"). She did so at the
7  express direction of her superior, Medallia's Vice President of Product Management. Ex. I, 113:6-
8  114:3, 11-13; 115:11-116:6 (describing direction to "go ahead and create a trial account"), 117:16-
9  22, 121:9-18, 134:5-14, Ex. J, 76:12-14, 78:2-3 (describing that she got approval to obtain access to
10 EchoSpan's trial and did so "at the direction of [her] boss"), 122:3-17). She further testified that
11 "[she] would not have created the trial account until [she] received confirmation [from the Vice
12 President Product Management] that it was okay." *Id.* at 255:14-18.
13     Medallia's Vice President of Product Management was not the only person at Medallia who
14 approved and directed that she and members of her team access EchoSpan's system. That Vice
15 President ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. Q; Ex. I, 129:19-130:8; 131:13-132:9; Ex. J, 122:19-123:7; 132:8-13. ▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮. Ex. Q. This direction conferred actual authority to bind Medallia to the terms of the
22 trial account. O.C.G.A. § 10-6-1; Restatement (Third) of Agency § 2.01 (2006) ("An agent acts
23 with actual authority when, at the time of taking action that has legal consequences for the
24 principal, the agent reasonably believes, in accordance with the principal's manifestations to the
25 agent, that the principal wishes the agent so to act.").
26     Additionally, Medallia conferred authority by ratifying the product managers' enrollment in,
27 and use of, the EchoSpan trial on Medallia's behalf. Under Georgia law, where a principal is fully
28 informed of an agent's unauthorized acts, it must repudiate them within a reasonable time or

authority is established. *Landcastle Acquisition Corp. v. Renasant Bank*, 57 F.4th 1203, 1231 (11th Cir. 2023) (citation omitted); *Morris v. Williams*, 448 S.E.2d 267, 269 (Ga. Ct. App. 1994) (failure to object to acts taken outside authority established authority by acquiescence); O.C.G.A. § 10-6-1. Here, corporate executives within Medallia knew of the trial access—they specifically directed the product manager to sign up for it—and were again informed of the trial in April 2021. At no point did Medallia take steps to repudiate the trial access or revoke the authority to sign up for the trial. Ex. J, 94:3-8 ("I must have told her that. . . I had [the trial account]"), 104:16-22, 93:17-21, 254:8-255:9, 14-18 ("I told [Vice President Product Management] there was an option for a trial account, at which point he asked me to create it. . . that was something he asked me to do."), 132:19-133:7 ("I was never reprimanded. . . [The EVP and CIO] was assuring me that what I had done was not wrong."); Ex. TT, 177:7-9 (CIO testifying that she did not repudiate signing up for trial access).

Lastly, this product manager also had apparent authority to bind Medallia to EchoSpan's Terms and Conditions. Medallia provided this employee—then titled the director of product management—with an email address with a Medallia domain and permitted her to hold herself out as a director "for anyone on the internet to see;" these acts are sufficient to create apparent authority to act on behalf of Medallia to sign up for a trial account of EchoSpan's and to agree to EchoSpan's Terms and Conditions—acts not unusual for someone in her role. *See Stone v. Shafran*, No. 22-80369-CV, 2022 WL 18780499, at *7 (S.D. Fla. Nov. 21, 2022) (apparent authority created by LinkedIn profile describing individual as "director" of company and provision of email address at defendant's domain). Ex. I, 58:1-11 (describing use of "@medallia.com" email address to sign up for a trial account, an account she only used for work functions); *see also* https://www.linkedin.com/in/pallavikapnadak/ (LinkedIn profile identifying Kapnadak as a "Director" at Medallia) (last visited July 17, 2023); Ex. B, 80:5-17 (testifying that a product manager may assess EchoSpan's tool for integration with an organization's systems). Accordingly, Medallia cannot "defeat the contract" by claiming that the employee lacked authority to sign up for EchoSpan's free trial. *Holliday Const. Co. v. Sandy Springs Assocs., Inc.,* 400 S.E.2d 380, 382 (Ga. Ct. App. 1990) (corporation could not disclaim signature of general manager where he had "at least apparent authority, if not actual authority" to enter into agreement).

**MEDALLIA BREACHED ECHOSPAN'S TERMS AND CONDITIONS.**

There is also no disputed issue of material fact that Medallia breached EchoSpan's Terms and Conditions. Medallia agreed not to use its access to EchoSpan's 360 System "to create derivative works based on the [360 System], reverse engineer the [360 System, or] access the [360 System] for the purpose of building a competitive product or service or copying its features or user interface." Ex W, Section 19.c. But that is precisely what it did. Medallia's product managers specifically and explicitly testified that they accessed the system to aid their build of a derivative work and competitive product and that they used that access to copy its features; their intent was to "understand the functionality" of a 360 tool and to "get as much as [they] can out of this trial account" to build their competing tool. *See, infra* p. 7; Ex. I, 112:16-19; Ex. J, 157:2-8; Ex. O, 73:12-16 (access to EchoSpan's 360 System was "to create a [competing] 360 review tool"); Ex. FF, ( ).[5]

Medallia further agreed that it would only use EchoSpan's trial account "for the purpose of evaluation of the [360 System] for purchase by [Medallia]." Ex W, Section 3.g. It did not. Its product managers testified that "there never was an intention to use EchoSpan in-house for Medallia's own HR purposes." Ex. O, 74:20-75:21 (product managers were not accessing EchoSpan's 360 System for potential purchase).

These acts and admissions similarly demonstrate Medallia breached its agreements that EchoSpan would retain ownership of its 360 System and trade secrets (it instead misappropriated

---

[5] *Id.* Medallia used its access to EchoSpan's 360 System to investigate both the *setting* that                              and also the *way in which it accomplishes that*. This is but one illustration of how Medallia's breached the Terms and Conditions in accessing to EchoSpan's 360 System; they expressly used it to determine how to build the features of its competing tool.

1  those),[6] Sections 4.d, 5; that Medallia would not "commercially exploit" its trial access to
2  EchoSpan's 360 System (it instead created its own competing 360 system after its use of
3  EchoSpan's, *see generally*, Ex. A), Section 4.d; that Medallia would protect EchoSpan's
4  Confidential Information (it instead divulged EchoSpan's Confidential Information throughout
5  Medallia, *infra* at 6, and subsequently used that Confidential Information in its own system, *see*
6  *generally*, Ex. A), Section 12.a, c; and that it would only use the 360 System in compliance with the
7  law (instead it violated various trade secret laws in its misappropriation of EchoSpan's trade
8  secrets), Section 19.b. Ex W.  There is no disputed material fact with regard to Medallia's breach of
9  EchoSpan's Terms and Conditions. *O'Brien as Tr. of Raymond F. O'Brien Revocable Tr. v. XPO*
10 *CNW, Inc.*, 362 F. Supp. 3d 778, 785 (N.D. Cal. 2018) (granting plaintiff's motion for summary
11 judgment on its breach of contract claim because no disputed issue of material fact existed as to
12 elements of claim).

### THE ███████████████████ MEDALLIA'S ACCEPTANCE OF THE TERMS AND CONDITIONS.

15  Medallia's primary defense to EchoSpan's breach of contract claim has been that the Terms
16 and Conditions were ███████████████████████████████
17 ████████████████████████████.  They were not. During those
18 ████████████████████████████████████████████
19 ████████████████████████████████████████████
20 ████████████████████████ Ex. SS, ████████ (emphasis added).  There is no
21 genuine dispute that the Terms and Conditions, which concerned trial access to EchoSpan's 360
22 System, fell outside the scope of ████████████████████████████
23 ███████████████.  *See Jenks v. DLA Piper Rudnick Gray Cary US LLP*, 196 Cal. Rptr. 3d 237,
24 249 (Cal. 4th 2015) (termination agreement did not supersede Offer Letter between same parties
25 because—though both were related to terms of employment and separation—subject matter of
26 termination agreement was terms of plaintiff's resignation and did not address dispute resolution

---

[6] As previously noted, EchoSpan does not move for summary judgment on its claims for violations of trade secret laws.

forum); *Atlanta Integrity Mortg., Inc. v. Ben Hill United Methodist Church*, 650 S.E.2d 359, 362 (Ga. Ct. App. 2007) (purchase agreement and subsequent escrow agreement dealing with real property did not merge because the purchase agreement included an obligation to complete construction and convey title, while the escrow agreement dealt only with the construction).[7] As the court found in *Jenks*, ███████████ the use of the EchoSpan trial—that subject is addressed only in the Terms and Conditions. Indeed, Medallia admitted that ███████████ ███████████ Ex. H, 310:8-311:4. ███████████ ). This testimony binds Medallia and prevents it taking a different position now. *See Snapp v. United Transportation Union,* 889 F.3d 1088, 1103 (9th Cir. 2018) (corporation cannot defeat summary judgment with affidavit that conflicts with corporate testimony).

## CONCLUSION

Because there is no genuine dispute as to any material fact concerning Medallia's breach of the Terms and Conditions, EchoSpan is entitled to summary judgment as to liability on Count I.

Dated: July 17, 2023        COUNCILL, GUNNEMANN & CHALLY, LLC

By: *Jonathan R. Chally*
Jonathan R. Chally (GA Bar No.141392)
(*Pro Hac Vice*)
jchally@cgc-law.com
Jennifer R. Virostko (GA Bar No. 959286)
jvirostko@cgc-law.com

LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (CA Bar No. 266966)
Rebecca Furman (CA Bar No. 294082)
Kenneth M. Walczak (CA Bar No. 247389)

*Attorneys for Plaintiff/Counter-Defendant EchoSpan, Inc.*

---

[7] Medallia may argue that the Order transferring the case to the this district holds otherwise, but that argument does violence to the ███████████ and asks too much of the Northern District of Georgia's interlocutory order on a different issue. The Northern District of Georgia's Order, Dkt. 60, applied the Section 1404(a) standard of whether the case should be transferred to this court; the court's interlocutory order determined only that ███████████ ███████████ *Id.* at 7. The claim at issue here relates to Medallia's improper usurpation of EchoSpan's information, not the ███████████ ███████████.