# Notice of Motion and Motion for Summary Judgment

# Public Redacted Version

MARC J. PERNICK (State Bar #160591)
mpernick@mkwllp.com
JASON R. BARTLETT (State Bar #214530)
jbartlett@mkwllp.com
MAURIEL KAPOUYTIAN WOODS LLP
450 Sansome Street, Suite 1005
San Francisco, California 94111
Telephone:  (415) 738 - 6334

Benjamin I. Fink (Georgia Bar No. 261090) *Pro Hac Vice*
bfink@bfvlaw.com
Jeremy L. Kahn (Florida Bar No. 0105277) *Pro Hac Vice*
jkahn@bfvlaw.com
BERMAN FINK VAN HORN P.C.
3475 Piedmont Road NE, Suite 1640
Atlanta, GA 30305
Telephone: (404) 261-7711

*Attorneys for Defendant*
MEDALLIA, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ECHOSPAN, INC., | ) Case No.:  5:22-cv-01732-NC |
| | ) |
| Plaintiff/Counter-Defendant, | ) **DEFENDANT'S NOTICE OF MOTION** |
| | ) **AND MOTION FOR SUMMARY** |
| | ) **JUDGMENT** |
| | ) |
| v. | ) |
| | ) Hearing Date: August 23, 2023 |
| | ) Time: 1:00 p.m. |
| MEDALLIA, INC., | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| | ) |
| | ) |

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

    PLEASE TAKE NOTICE that, on August 23, 2023, at 1:00 p.m., a hearing will be held before the Honorable Nathanael M. Cousins at the San Jose Courthouse, 280 South 1st Street, Courtroom 5 – Fourth Floor, San Jose, CA 95113 on Defendant's Motion for Summary Judgment.

**STATEMENT OF REQUESTED RELIEF**

    Defendant Medallia, Inc. respectfully requests that the Court enter summary judgment in its favor on EchoSpan's claims against it and on its counterclaim.

1

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ...................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES .......................................1

    I.     INTRODUCTION ..........................................................1

    II.    FACTUAL AND PROCEDURAL BACKGROUND ................................1

        A.   ██████████ is a long-time customer of both Medallia and EchoSpan............................................................... 1

        B.   E360 tools are not unique, and all have similar features and functionalities...........................................................2

        C.   ██████████ issues an RFP due to dissatisfaction with EchoSpan..........................................................3

        D.   EchoSpan does not participate in the RFP; Medallia does and wins the business.............................................................4

        E.   Pallavi Kapnadak signs up for an EchoSpan free trial................5

        F.   Bank of America sends detailed requirements and provides extensive information............................................................9

        G.   Medallia and EchoSpan discuss a potential acquisition.................11

        H.   Medallia continues working and ██████████ informs EchoSpan of its decision......................................................13

        I.   Nothing in Medallia's tool is based on anything from the free trial or acquisition talks............................................................14

        J.   EchoSpan files suit......................................................15

    III.   ARGUMENT AND CITATIONS OF AUTHORITY...................15

        A.   EchoSpan's trade-secret misappropriation claims fail as a matter of law. ...............................................................15

        B.   The Copyright Act preempts EchoSpan's state-law claims.............28

        C.   EchoSpan's claim for breach of contract fails as a matter of law......31

        D.   Any damages must be capped at $0.00...................................34

        E.   EchoSpan cannot claim damages based on its loss of the ██████ relationship.............................................................35

i

F.   The Court should grant Medallia summary judgment on its
counterclaim……………………………………………………………..…..35

IV.   CONCLUSION ...........................................................................................35

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

## TABLE OF AUTHORITIES

### CASES

*Allergan, Inc. v. Merz Pharm., LLC*,
 No. SACV 11-446 AG (EX), 2012 WL 13134616 (C.D. Cal. Feb. 1, 2012) ...................... 26

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of Cal.*,
 No. 2:10-CV-09378-CBM, 2012 WL 7683452 (C.D. Cal. Nov. 20, 2012)........................... 30

*Auld v. Forbes*,
 848 S.E.2d 876 (Ga. 2020) ........................................................................................... 28

*Capital Mgmt., LLC v. Wells Cap., Inc.*,
 714 S.E.2d 393 (Ga. App. 2011) .................................................................................. 24

*Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*,
 No. 15CV2926DRHSIL, 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020) ........................... 19

*Cellofoam N. Am. Inc. v. Kustes*,
 No. 1:19-CV-2159-MHC, 2021 WL 9274549 (N.D. Ga. Dec. 21, 2021) ......................... 34

*CSX Transp., Inc. v. Recovery Express, Inc.*,
 415 F. Supp. 2d 6 (D. Mass. 2006) .............................................................................. 32

*Glock v. Glock*,
 247 F.Supp.3d 1307 (N.D. Ga. 2017) .......................................................................... 28

*Hennessy v. Woodruff*,
 82 S.E.2d 859 (Ga. 1954)............................................................................................. 33

*Idema v. Dreamworks, Inc.*,
 162 F. Supp. 2d 1129 (C.D. Cal. 2001), *aff'd in part, dismissed in part*, 90 F.
 App'x 496 (9th Cir. 2003)....................................................................................... 29, 30

*IDX Systems Corp. v. Epic Systems Corp.*,
 285 F.3d 581 (7th Cir. 2002)....................................................................................... 20

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
 978 F.3d 653 (9th Cir. 2020)....................................................................................... 20

*Jobscience, Inc. v. CVPartners, Inc.*,
 No. 13-CV-04519-WHA, 2014 WL 1724763 (N.D. Cal. May 1, 2014) ......................... 20

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*,
 886 F.2d 1173 (9th Cir. 1989)..................................................................................... 29

*KEMA, Inc. v. Koperwhats*,
 658 F. Supp. 2d 1022, 1031 (N.D. Cal. 2009)  ........................................................... 19

*Kiskadee Commc'ns (Bermuda), Ltd. v. Father*,
 No. C 10-05277 WHA, 2011 WL 1044241 (N.D. Cal. Mar. 22, 2011)........................... 21

*Laws v. Sony Music Ent., Inc.*,
 448 F.3d 1134 (9th Cir. 2006)................................................................................ 29, 30

*Lobue v. Countrywide Home Loan, Inc.*,
  No. 14-CV-04878-BLF, 2015 WL 13385920 (N.D. Cal. July 29, 2015) ............................... 21

*M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*,
  400 F. Supp. 3d 867 (N.D. Cal. 2019) .................................................................. 26

*Mktg. Info. Masters, Inc. v. Bd. of Trs. of Cal. State Univ. Sys.*,
  552 F. Supp. 2d 1088 (S.D. Cal. 2008) ................................................................. 30

*Ohio S. Exp. Co. v. Beeler*,
  140 S.E.2d 235 (Ga. App. 1965) ......................................................................... 28

*Opperman v. Path, Inc.*,
  No. 13-CV-00453-JST, 2014 WL 246972 (N.D. Cal. Jan. 22, 2014) ............................... 33

*PaySys Int'l, Inc. v. Atos Se*,
  No. 14-CV-10105 (KBF), 2016 WL 7116132 (S.D.N.Y. Dec. 5, 2016) ........................... 19

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
  318 F.3d 1284 (11th Cir. 2003) ........................................................................... 25

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ............................................................................... 29

*Powell v. Norman Elec. Galaxy, Inc.*,
  493 S.E.2d 205 (Ga. App. 1997) .......................................................................... 33

*Space Data Corp. v. Alphabet Inc.*,
  No. 16-CV-03260-BLF (NC), 2018 WL 10647160 N.D. Cal. May 8, 2018) ..................... 20

*Synopsys, Inc v. Risk Based Sec., Inc.*,
  70 F.4th 759 (4th Cir. 2023) ............................................................................... 25

*Taylor v. Universal Music Corp.*,
  No. CV1207507RGKAJWX, 2013 WL 12136369 (C.D. Cal. Mar. 19, 2013) ................... 30

*Warehouse Sols., Inc. v. Integrated Logistics, LLC*,
  No. 1:11-CV-02061-RLV, 2014 WL 12647878 (N.D. Ga. July 7, 2014) ......................... 21

*Wrench LLC v. Taco Bell Corp.*,
  256 F.3d 446 (6th Cir. 2001) ............................................................................... 30

## <u>OTHER AUTHORITIES</u>

17 U.S.C. § 106 ................................................................................................. 29

17 U.S.C. § 301 ................................................................................................. 28

28 U.S.C. § 705 ................................................................................................. 19

2A C.J.S. Agency § 379 ...................................................................................... 21

Defend Trade Secrets Act 18 U.S.C. § 1839 ........................................................... 15

Georgia Trade Secrets Act O.C.G.A. § 10-1-761 ..................................................... 15

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

1  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2  **I. INTRODUCTION**

3      EchoSpan's claims fail as a matter of law. EchoSpan lost the business of ███████

4  because it declined to participate in a request for proposal ("RFP") issued by the ███ The ███

5  undisputed testimony is that EchoSpan's failure to respond to the RFP sealed its fate well *before*

6  any Medallia employee accessed a free trial and well *before* Medallia engaged in due diligence

7  discussions with EchoSpan. The undisputed facts further show that Medallia won the bank's

8  business well *before* the free trial and the due diligence. Thus, neither the free trial nor the

9  acquisition discussions could have affected the bank's selection of Medallia. The undisputed facts

10  also show that none of the allegedly confidential information or trade secrets that form the basis

11  for EchoSpan's claims are confidential, as EchoSpan publishes extensive information about its

12  software tool on the internet showing how the features it claims as "trade secrets" work, including

13  through screenshots, product guides, and video tutorials. EchoSpan also has zero evidence that

14  Medallia used any information from the free trial or acquisition discussions in the development of

15  its software for the bank. Rather, the undisputed facts show that Medallia's development of its

16  software for the bank was 100% driven by detailed requirements the bank provided. For these and

17  other reasons discussed below, Medallia is entitled to summary judgment on EchoSpan's claims.

18  Medallia is also entitled to summary judgment on its counterclaim for breach of a Non-Disclosure

19  Agreement ("NDA") the parties executed during their acquisition discussions.

20  **II. FACTUAL AND PROCEDURAL BACKGROUND**

21      **A. ███████████ is a long-time customer of both Medallia and EchoSpan.**

22      Medallia and EchoSpan were both vendors for ███████████ for different, but related,

23  services. Medallia has provided customer and employee experience management software since

24  2001. Ex. A, Dep. of R. Cameron at 93:16–94:17. Customer experience management refers to

25  managing and tracking customers' experiences and interactions with a company, mainly through

26  customers completing surveys. Employee experience management, which includes employee

27  engagement or employee satisfaction, is similar but relates to employees' experiences at a

28  company. Ex. B, Dep. of Bank of America ("Bank Dep.") at 15:3–12; *id.* at 27:14–16; Ex. C, Dep.

1

of EchoSpan Corp. Rep. J. Vance ("EchoSpan Dep.") at 72:22–73:10.[1] Medallia has been Bank of America's vendor for its customer experience programs and, to some extent, employee experience and engagement programs for years. Ex. A, Cameron Dep. at 96:16–97:19, 104:5–8; Ex. B, Bank Dep. at 90:5–9, 144:4–13; Ex. D, Dep. of C. Luton at 25:13–26:12, 51:25–52:10.

EchoSpan is a software company that primarily provides a web-based employee 360-degree review ("E360") tool. An E360 tool allows employees and managers to review each other. The purpose of 360-degree feedback is to provide developmental feedback to an employee based on surveys completed by other employees. Ex. B, Bank Dep. at 15:3–22; Ex. C, EchoSpan Dep. at 73:2–74:5. While the bank used Medallia for its customer experience programs and certain employee experience programs, ███████████. Ex. B, Bank Dep. at 18:20–19:5.

Another process for collecting information about employees, performance management, involves setting expectations and goals—an employee setting individual goals, a manager cascading goals to their team, or an administrator cascading goals to groups of people—and assessing and monitoring progress on those goals. *Id.* at 17:1–24, 44:7–45:15. Before 2021, ████ ████████████████████████████████████████████████████. *Id.* at 19:6–20:21. ████████████████████████████████████████████ *Id.*

**B. E360 tools are not unique, and all have similar features and functionalities.**

As Bank of America's subject-matter expert on E360 explained, "████████████ ████████████████████████████." *Id.* at 42:20–21, 144:19–24; *see also* Ex. E, Dep. of A. Han at 51:25–54:4 ("I think it's fairly standard. I mean, again, I've worked at a lot of different companies, and it's all pretty much the same. . . . Like, this basic functionality is the same."). While the bank has hundreds of requirements for an E360 software tool, the critical features or "████████████" of *any* such tool are that ████████████████████████████████ ████████████████████████████████████████████████

---

[1] Volumes I and II of this deposition are consecutively paginated so they are not cited separately.
[2] In an E360 tool, ████████████████████████████████████████ Ex. C, EchoSpan Dep. at 42:23–43:17.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC



Ex. B, Bank Dep. at 35:24–37:14, 38:14–20, 38:22–39:8, 41:8–11.

For Bank of America specifically, ██████. *Id.* at 37:15–25. The bank also values ██████. *Id.* at 39:9–15. It is also important for the bank ██████. *Id.* at 49:1–8. It is also ██████. *Id.* at 161:15–162:13.

**C.** ██████ **issues an RFP due to dissatisfaction with EchoSpan.**

██████. Ex. B, Bank Dep. at 89:4–10. This was the first time ██████. Ex. C, EchoSpan Dep. at 122:18–124:19, 165:1–13; Ex. F, Dep. of E. McCall at 169:23–25.

██████. Ex. B, Bank Dep. at 63:9–64:22, 66:11–67:4. In other words, the bank ██████. *Id.* at 75:2–5, 89:19–90:1. The bank understood ██████ (which Medallia was providing). *Id.* at 144:4–17.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

1   *Id.* at 63:9–24, 65:4–66:21, 68:2–15, 72:1–8, 73:16–74:4, 75:9–18, 142:17–143:7, 150:9–

2   151:4; Ex. C, EchoSpan Dep. at 454:3–455:8.

3

4   . Ex. B, Bank Dep. at 72:9–23.

5   sometimes on a weekly basis. Ex. G, King Dep. at 143:14–144:4.

6   **D. EchoSpan does not participate in the RFP; Medallia does and wins the business.**

7

8   . Ex. B, Bank Dep. at 142:3–

9   11, 151:14–20.

10

11   Ex.

12   H, Email from J. Vance to                (Nov. 14, 2019) (EchoSpan Dep. Ex. 29); Ex. C, EchoSpan

13   Dep. at 212:9–213:11.

14   Ex. C, EchoSpan Dep. at 213:24–214:5.

15   . *Id.* at 223:15–25; Ex. B, Bank

16   Dep. at 144:1–3.

17   . Ex. B, Bank Dep. at 143:8–12 (confirming bank "

18   "); *id.* at 143:14–25

19   (confirming "

20   "); *id.* at 162:17–163:7 (confirming,

21

22   ). Bank of America

23   was only "                                    ." *Id.* at 143:20–25. Indeed,

24

25   *Id.* at 164:14–165:13 (                                    ).

26   . *Id.* at 142:12–16, 151:5–8.

27   *Id.* at 101:1–21,

28   102:15–23.                . *Id.* at 151:21–152:9.



. *Id.*

. *Id.* at 144:4–13, 151:21–152:9.                                          . *Id.* at 151:21–152:9.

. *Id.* at 152:10–18.

. *Id.* at 102:7–14.

. *Id.* at 103:3–7.

. *Id.* at 152:19–153:15.

. *Id.* at 153:19–154:16; Ex. I, Bank Dep., Def. Ex. 6.

. Ex. I, Bank Dep., Def. Ex. 6.

. Ex. B, Bank Dep. at 111:6–15,121:4–8.

. *Id.* at 137:10–23.

. *Id.* at 110:8–18, 111:16–20, 155:1–17. During this time,

. *Id.* at 155:1–17.

Ex. J, Bank Dep., Def. Ex. 9.

**E.  Pallavi Kapnadak signs up for an EchoSpan free trial.**

Pallavi Kapnadak was a director of product management at Medallia who worked on the

5

E360 and performance management product that Medallia was building for Bank of America. Ex. K, Dep. of P. Kapnadak (Vol. I) at 21:19, 26:3–10. Product management employees such as Ms. Kapnadak communicate with customers to understand their requirements and then relay those requirements to the design team. *Id.* at 90:14–91:1. Ms. Kapnadak led the charge of speaking with members of the Bank of America team about their requirements, but she did not lead the effort to design or build the E360 solution. Ex. L, Dep. of P. Kapnadak (Vol. II) at 33:1–34:5.

The other product management employees that Ms. Kapnadak worked with on the Bank of America project were Jack Robbins and Felix Li. Ex. K, Kapnadak Dep. (Vol. I) at 91:2–6. The employees from the design department with whom Ms. Kapnadak worked on this project were Lauren Schupp and Alice Han, who worked on product mockups and requirements. *Id.* at 91:7–17; Ex. B, Bank Dep. at 123:2–9. From February to April 2021, Ms. Kapnadak, Mr. Robbins, Mr. Li, Ms. Han, and Ms. Schupp were the primary people on the product team involved on a day-to-day level in the Bank of America project. Ex. L, Kapnadak Dep. (Vol. II) at 35:5–10.

But these employees did not work on the building, programming, or engineering of the tool. Ex. E, Han Dep. at 31:9–13; Ex. K, Kapnadak Dep. (Vol. I) at 36:4–22; Ex. M, Dep. of J. Robbins at 13:18–14:4; Ex. N, Dep. of F. Li at 14:10–15:2. Medallia's engineering team, of which these employees were not a part, performed the actual programming and coding, or "building," of the tool. Ex. K, Kapnadak Dep. (Vol. I) at 36:4–22; Ex. M, Robbins Dep. at 10:12–11:1. As a matter of process, employees on the design team come up with the design for a product and then share that concept with the engineering team to build. Ex. K, Kapnadak Dep. (Vol. I) at 37:1–8. Designs for a product would be based on the customer's needs and requirements. *Id.* at 37:13–15.

Ms. Kapnadak did not have experience with E360 and wanted to understand the functionality of an E360 platform. *Id.* at 112:16–19, 143:3–9, 148:3–14. On January 13, 2021, as part of her efforts to gain that general understanding, she signed up for a 30-day free trial of EchoSpan's E360 tool offered on EchoSpan's website. *Id.* at 111:1–112:9, 117:3–8, 148:3–14. While it is disputed whether Ms. Kapnadak's manager, Saurin Shah, instructed her to sign up for the trial or Ms. Kapnadak told Mr. Shah about the existence of the free trial and asked if it was ok to sign up for one, *see* Ex. O, Dep. of S. Shah (Vol. II) at 62:20–24, 69:15–70:1, it is undisputed

1   that Mr. Shah told Ms. Kapnadak in a Slack message to not mispresent anything on EchoSpan's

2   form if she signed up.[3] Ex. L, Kapnadak Dep. (Vol. II) at 118:13–119:19, 264:19–265:7; Ex. P,

3   Kapnadak Dep. (Vol. II), Ex. 5 (Jan. 13, 2021 Slack message). Contrary to this instruction, when

4   signing up for the trial, Ms. Kapnadak clicked a radio button indicating—and misrepresenting—

5   that her purpose was to evaluate the tool for internal use with employees at her organization. Ex.

6   L, Kapnadak Dep. (Vol. II) at 265:14–267:10; Dkt. 16-2 ¶¶ 13, 16.

7          EchoSpan claims that, as part of creating a trial account, Ms. Kapnadak agreed to its Terms

8   and Conditions on Medallia's behalf. But no one at Medallia is permitted to sign a contract on

9   Medallia's behalf without going through a specific approval procedure. Ex. A, Cameron Dep. at

10  47:6–16, 48:4–16, 49:1–13; Ex. Q, Signature Policy. Ms. Kapnadak, Mr. Robbins, and Mr. Li were

11  never given authority to enter into the Terms and Conditions on Medallia's behalf. Ex. K,

12  Kapnadak Dep. (Vol. I) at 202:21–203:13; Ex. M, Robbins Dep. at 135:21–25; Ex. N, Li Dep. at

13  102:7–10. And while EchoSpan initially alleged in its complaint that seven Medallia employees

14  agreed to the Terms and Conditions and sought access to and explored the tool as administrative

15  users, Dkt. 1-1 ¶¶ 40–41, 43–44, it admits in its interrogatory responses that those allegations are

16  untrue. Instead, only Ms. Kapnadak checked a box agreeing to the Terms and Conditions. Comp.

17  Ex. R, EchoSpan's Am. Interrog. Resp. ¶ 16, and Verification.

18         Ms. Kapnadak, in turn, gave Mr. Robbins, Ms. Li, and Ms. Han access as "secondary

19  account administrators." *Id.* EchoSpan claims these three employees somehow "indicated their

20  commitment" to the Terms and Conditions, without ever explaining how and while conceding that

21  they never checked any box indicating assent as Ms. Kapnadak did. *Id.* Contradicting its earlier

22  allegations, EchoSpan now admits that it has known all along that the three other employees

23  (Lauren Schupp, Diane Yip, and Brad Olcott) were merely granted an ability to access the trial but

24  never actually did access or "explore" it, seek administrative access, or agree to the Terms and

25  Conditions in any way. *Id.*; *see also* Dkt. 28-3 ¶ 7; Dkt. 28-4 ¶ 8; Dkt. 28-5 ¶ 7. Ms. Han also did

26  not access the trial account. Ex. E, Han Dep. at 36:16–37:1, 37:20–38:1, 55:18–21, 64:21–65:2.

27         Ms. Kapnadak did not use the free trial of EchoSpan's E360 tool for the purpose of reverse

28  ───────────────────────────

[3] The referenced disputed fact is not material to any grounds for summary judgment in this motion.

7

1    engineering it. Ex. K, Kapnadak Dep. (Vol. I) at 207:7–9. Nor is she aware of anyone else at
2    Medallia reverse engineering anything from the trial account. *Id.* at 207:10–12. Ms. Kapnadak's
3    use of the free trial "certainly wasn't meant to be followed and -- and copied or anything." Ex. L,
4    Kapnadak Dep. (Vol. II) at 173:8–174:19. She simply was trying to gain an "understanding [of]
5    what 360 product meant." Ex. K, Kapnadak Dep. (Vol I.) at 148:3–14; *see also* Ex. M, Robbins
6    Dep. at 73:17–74:10, 77:15–78:2 (stating that the trial access was part of the team educating
7    themselves "on this space as a whole"). Mr. Robbins also accessed the free trial only as part of an
8    initial education process, not for the purpose of copying it. Ex. M, Robbins Dep. at 139:11–140:9.

9        As a product manager with experience using lots of software products, Ms. Kapnadak's
10   impression of EchoSpan's E360 tool was that "it was outdated in terms of its design and user
11   experience." Ex. K, Kapnadak Dep. (Vol I.) at 208:12–17. EchoSpan's E360 tool, including its
12   design, was not something that she wanted to emulate for Bank of America. *Id.* at 208:18–209:9.
13   In fact, during the free trial, she sent Slack messages to her colleagues at Medallia stating her view
14   that EchoSpan's "UI [user interface] is very outdated" and that the E360 tool "looks like a late
15   '90s platform." Ex. L, Kapnadak Dep. (Vol. II) at 246:19–247:1. Mr. Li agreed that EchoSpan's
16   E360 tool "looks like something from the '90s." *Id.* at 248:3–11. In one exchange, Ms. Kapnadak
17   said that "EchoSpan UI sucks" and Mr. Li responded in agreement. *Id.* at 247:2–248:2.

18       In sum, the information Ms. Kapnadak gained from the free trial was limited to "an
19   overview of how it worked" as well as taking some screenshots of the tool. *Id.* at 159:11–160:11.
20   There is no evidence that Ms. Kapnadak or anyone else at Medallia accessed EchoSpan's source
21   code. Ex. C, EchoSpan Dep. at 135:3–15. EchoSpan easily could have monitored what Ms.
22   Kapnadak did with the E360 tool during the free trial, but it chose not to do so. *Id.* at 91:16–92:6.
23   Also, EchoSpan's senior software developer confirmed that none of the screenshots Ms. Kapnadak
24   took would be helpful in creating an E360 tool. Ex. G, King Dep. at 93:14–24; Ex. S, King Dep.
25   Ex. 54. And, perhaps most importantly, the undisputed testimony from Medallia and its former
26   employees is that nothing from the free trial was used in the development of Medallia's E360 tool.
27   Ex. K, Kapnadak Dep. (Vol. I) at 209:10–210:5, 210:17–211:5; Ex. E, Han Dep. at 64:21–65:2;
28   Ex. M, Robbins Dep. at 54:13–24, 115:18–116:8, 141:23–143:13; Ex. T, Dep. of S. Shah (Vol. I)

1     at 241:8–13; Dkt. 28-3 ¶¶ 5–6; Dkt. 28-4 ¶¶ 6–7; Dkt. 28-5 ¶¶ 5–6.

2     **F. Bank of America sends detailed requirements and provides extensive information.**

3     On February 3, 2021, Bank of America sent Medallia ███████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████. Ex. K, Kapnadak

8 Dep. (Vol. I) at 38:13–16 (stating that Bank of America provided a "████████████

9 ████████"); Ex. U, Email from Bank of America (Feb. 3, 2021) (Bank Dep. Def. Ex. D10).

10     After the bank sent its requirements, the bank and Medallia began having detailed meetings

11 and conversations. Ex. B, Bank Dep. at 121:18–122:2; Ex. K, Kapnadak Dep. (Vol. I) at 103:9–

12 14. Bank of America and Medallia had "███████████████████" in which they discussed

13 ████████████████████████████████████████████████████████████

14 ████████████. Ex. B, Bank Dep. 158:14–159:24. This included "█████████████

15 █████████. *Id.* Medallia built the solution it created for Bank of America based on the

16 requirements and these sessions. *Id.* at 159:20–160:4. Ms. Kapnadak worked closely with the bank

17 in these early conversations. *Id.* at 119:7–20. Mr. Robbins was also involved in the early

18 conversations with the bank about the product and requirements. *Id.* at 122:15–21.

19     During this series of Zoom meetings, Bank of America █████████████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████. Ex. K, Kapnadak

22 Dep. (Vol. I) at 37:16–38:8, 39:13–21, 46:6–10. At least during the time Ms. Kapnadak was

23 working on the E360 solution, there would be several hours of meetings per week. *Id.* at 46:11–

24 15. Bank of America ████████████ during these Zoom meetings, including ███████

25 ████████████████████. *Id.* at 211:6–22, 215:7–16. The bank did this not

26 for Medallia to replicate the EchoSpan tool, but ████████████████████████

27 ████████████████████████. *Id.* at 215:17–216:8.

28     To illustrate the requirements it was requesting, the bank also provided Medallia ████

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

1    ███████████████████████████████ Ex. B, Bank Dep.

2    at 157:19–158:10; Ex. L, Kapnadak Dep. (Vol. II) at 175:20–176:17, 202:3–15; Ex. U, Bank Dep.

3    Def. Ex. 10. The bank and Medallia also had ████████████████████████████

4    ███████████████████████████ Ex. L, Kapnadak Dep. (Vol. II) at 175:20–176:17.

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████. Ex. K, Kapnadak Dep. (Vol. I) at 212:1–14. From the time they

8    were sent, the bulk of Ms. Kapnadak's time at Medallia was spent on understanding the bank's

9    ██████████ requirements and sharing those requirements with engineers, which did not "ha[ve]

10   anything to do with EchoSpan." Ex. L, Kapnadak Dep. (Vol. II) at 207:13–208:3.

11       Bank of America did not tell Medallia that it wanted Medallia to deliver services that

12   approximated what EchoSpan previously provided; to the contrary, █████████████████

13   █████████. Ex. K, Kapnadak Dep. (Vol. I) at 72:10–20. For example, while the bank shared

14   ████████████████████████████████████████████████████

15   █████████████████████. *Id.* at 99:7–18. The bank also asked Medallia ████████

16   ███████████████████ *Id.* at 208:18–209:9, 215:17–216:8. In general, the bank

17   ████████████████████████████████████. *Id.*

18   at 215:17–216:8; *see also* Ex. L, Kapnadak Dep. (Vol. II) at 40:11–22, 112:14–113:7. In

19   communications with Medallia, the bank "████████████████████████████

20   █████████████ Ex. L, Kapnadak Dep. (Vol. II) at 230:1–18.

21       Once Bank of America sent the requirements spreadsheet and these meetings about

22   requirements got underway, Medallia's focus was those requirements, and no materials from the

23   free trial were used. Ex. K, Kapnadak Dep. (Vol. I) at 209:10–210:5, 210:17–211:5; Ex. E, Han

24   Dep. at 64:21–65:2; Ex. M, Robbins Dep. at 54:13–24, 115:18–116:8, 141:1–143:13. One hundred

25   percent of Medallia's design for its E360 tool came from the bank's requirements; *none* of it had

26   anything to do with the EchoSpan trial. Ex. K, Kapnadak Dep. (Vol. I) at 209:10–210:5, 210:17–

27   211:5; *see also* Dkt. 28-3 ¶¶ 5–6; Dkt. 28-4 ¶¶ 6–7; Dkt. 28-5 ¶¶ 5–6; Ex. E, Han Dep. at 64:21–

28   65:2; Ex. T, Shah Dep. (Vol. I) at 241:8–13; Ex. M, Robbins Dep. at 54:13–24, 115:18–116:8

1  ("[T]his was all kind of just sort of out the door and secondary once we got the actual requirements

2  from Bank of America."); *id.* at 141:23–143:13 (stating that the requirements "became the focus

3  of the entire project" so they had to "park" anything done with the free trial "and put it out the

4  door" and that EchoSpan was not even considered after receiving the requirements spreadsheet).

5  As Mr. Robbins put it, the bank's requirements spreadsheet "was everything that we were looking

6  at and everything that we needed." Ex. M, Robbins Dep. at 143:1–13.

**G. Medallia and EchoSpan discuss a potential acquisition.**

8  Early on, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮. Ex. B, Bank Dep. at 107:25–108:8, 120:5–17; Ex. K, Kapnadak Dep. (Vol. I) at

10  34:8–19, 43:5–11. This is because the bank and Medallia ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮. Ex. A, Cameron Dep. at 157:18–160:3, 166:1–167:25, 171:22–172:23.

13  The bank's expectations regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* So the E360 work was put on

15  hold while Medallia and the bank focused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B, Bank

16  Dep. at 107:25–108:8, 120:5–17; Ex. K, Kapnadak Dep. (Vol. I) at 34:8–19, 43:5–11.

17  In March 2021, to address the bank's need for a performance management solution,

18  Medallia's product team considered the possibility of acquiring another company with an existing

19  E360 and performance management product as an alternative to building its own solution. Ex. A,

20  Cameron Dep. at 157:9–160:16. EchoSpan was one of the companies considered. *Id.* at 178:8–

21  180:14. In April 2021, Medallia engaged in potential acquisition discussions with EchoSpan. *Id.*

22  at 266:14–267:8; Ex. C, EchoSpan Dep. at 159:17–20, 245:14–23. On April 13, 2021, as part of

23  these discussions, the parties executed an NDA. *Id.* at 161:6–12, 162:3–11, 162:20–163:5; Ex. V,

24  NDA (EchoSpan Dep. Ex. 15). EchoSpan then sent some information to Medallia, including

25  financial statements and its Confidential Information Memorandum. Ex. C, EchoSpan Dep. at

26  170:23–171:18; Ex. W, Email with Attachments (EchoSpan Dep. Ex. 16.).

27  When performing its due diligence, Medallia was primarily interested in the security,

28  architecture, and scalability of EchoSpan's platform. Ex. A, Cameron Dep. at 53:2–12, 260:17–

24, 282:5–24. On April 19, 2021, Mr. Vance had a Zoom meeting with several individuals at Medallia during which he provided a "[v]ery executive level" walkthrough of the tool "a little bit" and answered general questions about EchoSpan's technology and business. Ex. C, EchoSpan Dep. at 175:24–176:20, 176:25–177:2, 309:17–19. The discussion about technology was a question about the type of programing language EchoSpan used (Microsoft ASP), which EchoSpan agrees is not confidential information. *Id.* at 178:8–22; Ex. A, Cameron Dep. at 279:17–280:12. During the parties' discussions, Medallia expressed concerns about the fact that Microsoft was no longer going to support ASP. Ex. C, EchoSpan Dep. at 188:9–189:15,189:24–190:7.

A second and final Zoom meeting took place on April 27, 2021. *Id.* at 181:3–18, 190:8–14, 309:17–19. This discussion was about the security of EchoSpan's E360 tool, methods for porting EchoSpan's tool to Medallia's environment, and the types of servers EchoSpan's tool was running on. *Id.* at 182:4–19, 183:3–17. Mr. Vance also started a demonstration of the tool, but it was quickly "abandoned" because "it just wasn't relevant to the discussion." *Id.* at 182:20–183:2, 187:12–15. As Mr. Vance put it, the individuals on the Medallia side "didn't really care" about a demonstration of how the tool worked. *Id.*; *see also* Ex. A, Cameron Dep. at 282:5–24. In fact, in neither Zoom meeting were demonstrations of the tool a huge focus and, aside from the demonstrations that were "not the primary focus" of the calls, nothing about the functionality of EchoSpan's E360 tool was disclosed on either call. Ex. C, EchoSpan Dep. at 198:3–18, 199:12–19. Furthermore, there is no evidence that on either call EchoSpan displayed any of the alleged trade secrets listed on EchoSpan's trade secret disclosure. *Id.* at 199:21–200:15.

As a follow-up to this second meeting, EchoSpan sent two Veracode reports that Medallia requested, which are reports related to the security of the tool. *Id.* at 184:1–22, 190:15–191:17, 191:23–192:1. EchoSpan also sent Medallia ████████████████████████. *Id.* at 192:8–11, 193:11–18, 194:5–23. EchoSpan did not provide Medallia any additional information in the acquisition discussions. *Id.* at 197:19–198:2, 202:5–15. Medallia ultimately decided to not purchase EchoSpan. Ex. A, Cameron Dep. at 348:23–349:2.

Medallia's interest in potentially acquiring EchoSpan was legitimate; it did not approach EchoSpan for the purpose of obtaining information to develop its own product. *Id.* at 269:21–

270:17, 271:24–273:4. Nothing EchoSpan provided Medallia during the acquisition discussions was used to create Medallia's E360 solution or for any purpose other than to consider whether to acquire EchoSpan, and none of the information was shared outside Medallia's due diligence team. *Id.* at 327:12–23; Ex. X, Dep. S. Khanna at 242:14–243:3; Ex. Y, Dep. of R. Mehta at 103:18–104:8, 112:7–24, 113:13–20, 119:23–120:14, 120:18–121:4, 121:13–23, 122:8–17; Ex. T, Shah Dep. (Vol. I) at 241:16–20; Dkt. 28-3 ¶ 8; Dkt. 28-4 ¶ 9; Dkt. 28-5 ¶ 8. In particular, Ms. Kapnadak had no role in these discussions and no one on the acquisition team shared with her anything learned or obtained from EchoSpan. Ex. A, Cameron Dep. at 276:2–5; Ex. K, Kapnadak Dep. (Vol. I) at 213:18–214:5, Ex. Y, Mehta Dep. at 98:25–99:18. While there is no evidence anything was shared or used regardless, nothing provided in these discussions would even be helpful to Medallia in building its own E360 solution. Ex. A, Cameron Dep. at 274:3–9, 278:6–280:19, 282:5–24, 284:25–285:4, 327:24–328:12, 329:22–330:16. Even EchoSpan's senior software developer confirmed that the PowerPoint slides of ███████████████████████ would not help at all in creating an E360 tool. Ex. G, King Dep. at 90:4–21; Ex. Z, King Dep. Ex. 24.

**H. Medallia continues working and ████████████ informs EchoSpan of its decision.**

Ms. Kapnadak left Medallia in mid-May 2021. Ex. L, Kapnadak Dep. (Vol. II) at 51:9–13. As of that time, Medallia's work on its E360 tool was barely started beyond some early designs, and Medallia was just collecting requirements from the bank for the performance management solution. Ex. K, Kapnadak Dep. (Vol. I) at 34:8–35:3. The bank and Medallia did not start working on specific requirements for E360 until later, at which point different product designers (i.e., not Ms. Kapnadak) were working on the project. Ex. B, Bank Dep. at 107:25–108:8, 120:5–17.

Despite feigning in this lawsuit that the loss of ████████████ was unexpected, ████████████████████████████████████████████ For example, on June 3, 2021, EchoSpan's senior software developer emailed Mr. Vance about ███████████ "████████████████████████████████████████ " Ex. AA, Email from L. King to J. Vance (June 3, 2021) (ESPAN_00142067). On June 30, 2021, ████████████████████████████ ██████████████████████████████████ Ex. C, EchoSpan Dep. at 235:5–236:3.

1    On July 15, 2021, EchoSpan emailed ███████████. *Id.* at 240:1–12.  In that email, Mr.

2    Vance disclosed ████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████████████

4    ██████." Ex. BB, Email from J. Vance to ███████ (July 15, 2021) (EchoSpan Dep. Ex. 39).

5    ████████████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████████████████." *Id.*

7    **I.    Nothing in Medallia's tool is based on anything from the free trial or acquisition talks.**

8    Having used both EchoSpan's and Medallia's E360 tools, ██████████████████,

9    ██████████████████████████████████████████. Ex. B, Bank Dep. at 127:1–11.

10   ████████████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████. *Id.* at 129:16–130:5, 132:21–

12   134:5. ████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████

14   █████. *Id.* at 130:6–131:9, 132:21–134:5. EchoSpan's senior software developer confirmed that

15   ████████████████████████████████████████████████████████████████████████████

16   █████████████████. Ex. G, King Dep. at 191:23–192:9.

17   Also, each of the alleged trade secrets either were ████████████████████

18   ████████████ or were not included in Medallia's tool. The "████████████████" functionality

19   ██████████████████████████████████████████████████████████████████████████

20   ██████████████████████████. Ex. B, Bank Dep. at 144:25–145:14. The "████████," "████

21   ██████ and "██████████████████████" features are also ██████████████████████.

22   *Id.* at 146:12–20, 147:16–22. The "██████████████" feature is ████████████████████

23   █████████████ and that it ██████████████████████████████████████████████████.

24   *Id.* at 145:15–146:11. Likewise, ████████████████████████████████████████████

25   █████, ██████████████████████████████████████████████████. *Id.* at 146:21–147:4.

26   Indeed, ████████████████████████████████████████████████████████████████████

27   ███████████████████████████████████████████████████████████. *Id.* at 147:5–14.

28   EchoSpan's own senior software developer confirmed that, ████████████████████████

1

2

3

4 ." Ex. G, King Dep. at

5 110:8–111:24.

6 . *Id.*

7 **J. EchoSpan files suit.**

8      On September 24, 2021, EchoSpan filed this action. It asserts claims against Medallia for

9 breach of contract, violation of the Georgia Trade Secrets Act (GTSA), and violation of the federal

10 Defend Trade Secrets Act (DTSA). The crux of these claims is that Medallia allegedly

11 "

12 ." Dkt. 1-1 ¶ 64.

13 **III. ARGUMENT AND CITATIONS OF AUTHORITY**

14      **A. EchoSpan's trade-secret misappropriation claims fail as a matter of law.**

15          **1. EchoSpan cannot prove any trade secret.**

16      The federal Defend Trade Secrets Act (DTSA) and the Georgia Trade Secrets Act (GTSA)

17 define a "trade secret" similarly. The DTSA's definition requires that the owner of the alleged

18 trade secret "has taken reasonable measures to keep such information secret" and that the

19 information "derives independent economic value, actual or potential, from not being generally

20 known to, and not being readily ascertainable through proper means by, another person who can

21 obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The

22 GTSA likewise requires that the information be the "subject of efforts that are reasonable under

23 the circumstances to maintain its secrecy" and "[d]erives economic value, actual or potential, from

24 not being generally known to, and not being readily ascertainable by proper means by, other

25 persons who can obtain economic value from its disclosure or use." O.C.G.A. § 10-1-761(4). There

26 are thus three requirements for information to be a trade secret under both statutes: (1) it is not

27 generally known or readily ascertainable by proper means; (2) it is subject to reasonable efforts to

28 maintain its secrecy; and (3) it has actual or independent economic value based on its secrecy.

Here, EchoSpan's alleged trade secrets do not satisfy any of these requirements.

### i. The alleged trade secrets are not secret.

At the time of the alleged misappropriation, the alleged "trade secrets" were publicly available or readily ascertainable from publicly available information, matters of general knowledge in the trade, or information provided by BofA (i.e., other proper means). There is a wealth of public information about EchoSpan's E360 tool that EchoSpan itself publishes on its public-facing website (i.e., the parts that do not require any login credentials) and two YouTube channels on which it publishes videos to the public. Ex. C, EchoSpan Dep. at 139:15–141:20, 145:2–25, 151:16–22. A person viewing the videos can see the functionality of the E360 tool and what it does, and the EchoSpan website contains a whole host of information about EchoSpan's E360 tool. *Id.* at 143:19–144:13, 145:19–25. EchoSpan concedes that nothing that can be seen on the public-facing website or videos is confidential or a trade secret. *Id.* at 109:6–11, 141:21–143:8.

Each of the features of EchoSpan's E360 tool that EchoSpan alleges are trade secrets (except Alleged Trade Secret No. 5) are not only identified, but are extensively described or illustrated in product guides, screenshots, and video tutorials. *See* Comp. Ex. CC, Publicly Available Information re: Alleged Trade Secret No. 1; Comp. Ex. DD, Publicly Available Information re: Alleged Trade Secret No. 2; Comp. Ex. EE, Publicly Available Information re: Alleged Trade Secret No. 3; Comp. Ex. FF, Publicly Available Information re: Alleged Trade Secret No. 4; Comp. Ex. GG, Publicly Available Information re: Alleged Trade Secret No. 6; Comp. Ex. HH, Publicly Available Information re: Alleged Trade Secret No. 7; Comp. Ex. II, Publicly Available Information re: Alleged Trade Secret No. 8.[4]

EchoSpan praises itself for publicly sharing a large amount of information about its E360 tool on its website. *Id.* at 147:11–17. In an article on its website entitled, "Why We Show Images

---

[4] Alleged Trade Secret No. 9 is purportedly the "█████████████████████████" in the other alleged trade secrets. But all of these are features are advertised as features of the same software tool, so their "███████ is no more a trade secret than the individual features. A compilation of public information can be a trade secret where the compilation itself is a secret, such as the compilation of public contact information of customers. This is nothing remotely close to that and EchoSpan cannot simply declare "███████ as a shibboleth for trade-secret protection. Furthermore, EchoSpan has no evidence that ████████████████████████████ █████ is somehow included in Medallia's E360 tool. Instead, EchoSpan's sole evidence is the similarities between some discrete features, not the features' interaction with each other.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

of Our Product On Our Site," EchoSpan boasts that "most of all, we're complimented on the number of images and screen captures we have of our actual product–images that are visible to any visitor without signing up for a trial, demo, or sales call" and that "[v]isitors are pleased to see and experience the actual software they are interested in purchasing." Ex. JJ, EchoSpan Dep. Ex. 12. As EchoSpan states, "We're big on showing off our product" such that "[a]lmost every page of our site has images of our product" and that one webpage has "more product images than most [of] our competitors have on their entire site." *Id.* EchoSpan continues, "It seems essential to us that a company actually shows the product they are selling on their site." *Id.* EchoSpan then criticizes competitors that do "not openly display their product on their website." *Id.*

EchoSpan's senior software developer agreed that many of the attributes of the tool that EchoSpan identifies (and redacts) in its complaint as confidential or trade secrets are publicly disclosed on EchoSpan's website, including:



- "[                                                                                ]"

- "[                                                                                ]."

- "[                                                                    ] . . . ."

- "[                                                        ]"

- "[                                                                                ]

- "[                                                                    ]."

Ex. G, Dep. of L. King at 107:3–18, 108:6–12, 17–24, 109:7–24; Ex. KK, King Dep. Ex. 58 ¶¶ 9(a)–(e), 10, 11. EchoSpan's senior software developer agreed that he "certainly could" create an E360 tool using only screenshots, videos, and a list of features. Ex. G, King Dep. at 27:12–22.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

1    Indeed, he confirmed that merely the list of features on EchoSpan's public website alone would

2    be helpful to a software developer in creating an E360 tool. *Id.* at 86:18–87:11. As would the

3    publicly available product guides on EchoSpan's website, which contain screenshots of webpages

4    from the administrative side of EchoSpan's E360 tool. *Id.* at 88:7–89:8.

5         EchoSpan also admits that several of the alleged "trade secrets" in its trade secret disclosure

6    are disclosed or can be discerned from EchoSpan's public website. Ex. C, EchoSpan Dep. at

7    261:16–262:15, 266:12–25. In fact, EchoSpan publicly discloses all but one of the purported "trade

8    secrets" it has identified in this case. As discussed above, aside from the "████████████

9    ███ (Alleged Trade Secret No. 5, which EchoSpan has no evidence of anything remotely

10   similar being in Medallia's platform), each of the alleged trade secrets in EchoSpan's operative

11   trade secret disclosure (Dkt. 111-6) are not just disclosed, but how they work is extensively

12   described and illustrated in videos, screenshots, webpages, and product guides. And while

13   EchoSpan claims that its ████████████████ is confidential, *id.* at 269:15–270:5, 272:19–

14   273:15, its entire ██████████ is publicly available on the internet. Ex. F, McCall Dep. at

15   188:4–190:17; Ex. LL, McCall Dep. Ex. 106.

16        Further showing the lack of secrecy, EchoSpan has registered two copyrights related to its

17   E360 tool. Ex. C, EchoSpan Dep. at 56:3–6. One is for the reporting system and its output. *Id.* at

18   56:7–13. For example, EchoSpan's surveys contain content for which EchoSpan has obtained

19   copyright protection. *Id.* at 55:8–56:1. The types of reports that the E360 tool generates have also

20   been copyrighted. *Id.* at 57:24–58:4. EchoSpan's other copyright is for the *entire* E360

21   administrative tool in general. *Id.* at 56:7–57:4. There is a copyright notice at the bottom of *every*

22   page of the free trial of EchoSpan E360 tool *Id.* at 107:1–18. EchoSpan's copyrights include, *inter*

23   *alia*, ████████████ *Id.* at 274:8–15. EchoSpan's copyright submissions are publicly

24   available. Comp. Ex. MM, EchoSpan Copyright Deposits from U.S. Copyright Office.

25        By registering it for copyright—including depositing a code specimen with the Copyright

26   Office—EchoSpan put into the public domain a large swath of information about its E360 tool,

27   including not just its functionality but also the underlying source code for that functionality and

28   the reports that are the output of its software. *Id.* As a matter of law, nothing in EchoSpan's publicly

available copyright deposits can be a trade secret. *See* 28 U.S.C. § 705; *KEMA, Inc. v. Koperwhats*, 658 F. Supp. 2d 1022, 1031 (N.D. Cal. 2009); *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15CV2926DRHSIL, 2020 WL 1242616, at *9 (E.D.N.Y. Mar. 16, 2020); *PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105 (KBF), 2016 WL 7116132, at *8 (S.D.N.Y. Dec. 5, 2016).

The features were also provided to Medallia by other proper means: Bank of America. The bank provided Medallia ███████████████████████████████████████████ ███████████████████████████████████████████. The bank also spent several hours per week ███████████████████████████████████████████ ████████. The bank further provided ███████████████████████████████████ ████████. In addition to being publicly disclosed, ████████████████████ ███████████████████████████████████ provided to Medallia. For example, the bank confirmed ███████████████████████ ███████████████████████████████████████.

Finally, many of these features are well known in the industry and would be a part of *any* E360 tool. These include, among many others, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. Because the information is public or was ascertainable by proper means, EchoSpan's trade-secret claims fail as a matter of law.

**ii.      Software features and functions disclosed to end users are not trade secrets.**

While the alleged trade secrets are publicly disclosed or were readily ascertainable by proper means, they independently are not trade secrets as a matter of law because they all constitute features and functions of EchoSpan's E360 tool rather than any secret information underlying those features and functions (e.g., source code). EchoSpan's distinction between the "existence"

of the features and "the way these features work" is meaningless. EchoSpan does not claim that Medallia misappropriated or even had access to anything about *how* the features work, like underlying algorithms or source code. Instead, EchoSpan's "the way these features work" claim refers to *what* the features do, i.e, what appears on the screen when an end user utilizes the feature. As a matter of law, that is not a trade secret, particularly given how many employees of EchoSpan's customers—who did not agree to any confidentiality—had access to and used the software.

The Seventh Circuit's decision in *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002), is instructive. In that case, the plaintiff claimed that "the methods and processes underlying and the inter-relationships among various features making up IDX's software package" constituted trade secrets. *Id.* at 583. In affirming summary judgment for the defendant, the court explained that "details that ordinary users of the software could observe" are not trade secrets, as opposed to underlying algorithms and object code. *Id.* at 584. "[T]hings that any user or passer-by sees," such as the appearance of certain screens, "are exceedingly hard to call trade secrets" because they are "readily ascertainable by proper means." *Id.*, *cited and quoted with approval in InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020). The court suggested that such items could form the basis of a copyright claim but held that "a trade-secret claim based on readily observable material is a bust." *IDX*, 285 F.3d at 584.

This Court recognized the same distinction with respect to software design concepts disclosed to end users (not protected) and undisclosed design concepts (can be protected). *Space Data Corp. v. Alphabet Inc.*, No. 16-CV-03260-BLF (NC), 2018 WL 10647160, at *2 (N.D. Cal. May 8, 2018) (Cousins, M.J.). This Court likewise agreed that design and functionality are not trade secrets, as opposed to the details of *how* the design and functionality are achieved. *Id.* ("[T]hese are mere criteria and in no way tell the reader the secret of how it is done. No details are provided for *how* Jobscience allegedly achieves the desired design and functionality." (quoting *Jobscience, Inc. v. CVPartners, Inc.*, No. 13-CV-04519-WHA, 2014 WL 1724763, at *3 (N.D. Cal. May 1, 2014) (alterations in original)). Other courts agree that features and functions of a software program are not trade secrets. *E.g.*, *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, No. 1:11-CV-02061-RLV, 2014 WL 12647878, at *6 (N.D. Ga. July 7, 2014), *aff'd*, 610 F. App'x

881 (11th Cir. 2015); *Agency Solutions.Com, LLC v. TriZetto Grp.*, 819 F. Supp. 2d 1001, 1017, 1020–21, 1028 (E.D. Cal. 2011).

EchoSpan's likely rejoinder that it requires all users to agree to its Terms and Conditions or other confidentiality agreements does not change the result for two reasons. First, as discussed in more detail below, the definition of "Confidential Information" in the Terms and Conditions does not cover the functionalities of EchoSpan's tool. Second, while it may have confidentiality agreements with the organizations that are its customers, some of those customers include large multinational corporations with thousands of employees that have no legal obligation to keep anything they see in EchoSpan's tool confidential. That the organization may have agreed to confidentiality does not impose any legal obligation on its employees. While an agent may bind its principal, it is well established that the reverse is not true: "[a] principal cannot bind its agent." *Lobue v. Countrywide Home Loan, Inc.*, No. 14-CV-04878-BLF, 2015 WL 13385920, at *4 (N.D. Cal. July 29, 2015) (quoting *Kiskadee Commc'ns (Bermuda), Ltd. v. Father*, No. C 10-05277 WHA, 2011 WL 1044241, at *6 (N.D. Cal. Mar. 22, 2011)); *see also* 2A C.J.S. Agency § 379 ("An agent may bind a principal to a contract, but a principal cannot bind an agent.").

And here, the organizations include ███████████████████████████████████████. Ex. G, King Dep. at 136:2–15, 136:25–137:2, 137:13–14, 141:6–21. ██████████████████████████████████████████████████████████████. *Id.* at 136:25–137:2, 137:13–14, 141:6–21. ██████████████████████████████████████████████. *Id.* at 141:6–142:21; Ex. NN, King Dep. Ex. 64. Thus, EchoSpan knowingly made the administrative side of its tool fully available to numerous end users under no confidentiality obligation.

Also, ████████████████████████████████████████████████████████. Ex. F, McCall Dep. at 29:16–32:10. While not binding on these customers' employees in any event, the confidentiality provisions in these contracts do not cover the mere features of EchoSpan's tool or the way they work. For example, the

21

1

2

3

4 ██████████. Ex. OO, General Services Agreement (EchoSpan Dep. Ex. 26) ¶ 15.1. In

5 other words, ████████████████████████████████

6 ████████████████████████████████. As it broadly includes

7 "████████████████████████████████████████████" by

8 EchoSpan, it necessarily includes all features of the E360 tool and the way they work. Accordingly,

9 the features and functions of EchoSpan's E360 tool are not trade secrets as a matter of law.

10     **iii.**       **EchoSpan failed to make reasonable efforts to maintain secrecy.**

11        Independently fatal to EchoSpan's trade-secret claims is that EchoSpan failed to make

12 reasonable efforts to keep the information secret. According to EchoSpan, its E360 tool has been

13 licensed to hundreds of organizations, including large multinational organizations each with

14 thousands of employees. Ex. C, EchoSpan Dep. at 37:5–9, 38:24–39:3. At each such organization,

15 one employee is the "master administrator" with full access to everything in the E360 tool and the

16 ability to provide any level of access to other employees, from limited access to the same access

17 as the master administrator. *Id.* at 42:19–43:17, 43:25–45:3. ██████████████████

18 ████████████████████████████████. *Id.* at 54:3–19. In

19 addition ████████████████████████████████

20 ██████████████. *Id.* EchoSpan has also provided trial access to its E360 tool to

21 approximately 4,300 individuals.[5] *Id.* at 66:25–68:11.

22        For all EchoSpan's customers, non-administrative users of EchoSpan's E360 tool—targets,

23 raters, and auditors—do not need to agree to EchoSpan's Terms and Conditions to use the tool. *Id.*

24 at 45:20–46:19. Without agreeing to any terms, such employees of an organization that is an

25 EchoSpan customer can create rater lists and complete surveys and self-evaluations on the E360

26 tool. *Id.* at 45:20–46:19, 49:12–51:2. ████████████████████████

27 ────────────

28 [5] ████████████████████████████████████████████. Ex.
B, Bank Dep. at 125:11–126:1, 144:19–24.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

1    ████████ *Id.* at 54:24–55:5. EchoSpan concedes that ████████████████

2    ██████████ is not confidential or a trade secret. *Id.* at 55:8–56:1, 108:24–109:5.

3    While some administrative users at certain organizations have agreed to EchoSpan's Terms

4    and Conditions, many others have not. *Id.* at 58:12–25. For example, ████████████

5    ███████████████████████████████████████████████████████

6    ██████████████████████████████████████. *Id.* at 258:11–259:8.

7    ████████████████████████████████████████. Ex. F, McCall Dep. at

8    158:15–20; Ex. G, King Dep. at 127:6–20. In other words, ██████████████

9    ████████████████████████ without agreeing to EchoSpan's

10   Terms and Conditions or any other confidentiality agreement.

11   ███████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████

13   ████████████████████████████████████. Ex. G, King Dep. at 136:2–15.

14   ███████████████████████████████████████████████████████

15   ████████████████████████████████████. *Id.* at 136:25–137:2, 137:13–14, 141:6–21.

16   ███████████████████████████████████████████████████████

17   ████████████████████████████████████████████████. *Id.* at

18   141:6–142:21; Ex. NN, King Dep. Ex. 64. ██████████████████████████

19   ███████████████████████████████████████████████████████

20   █████████████████. Because EchoSpan allows numerous users to have administrative

21   access to its tool without agreeing to *anything*, it has failed as a matter of law to take adequate

22   measures to protect any purported secrecy. *See Warehouse*, 610 F. App'x at 885; *cf. InteliClear*,

23   978 F.3d at 661 (licensing agreements constituted reasonable measures where defendant failed to

24   provide examples of other end users not subject to a confidentiality agreement).

25   Nor are the Terms & Conditions themselves an adequate measure to protect the secrecy of

26   features and functions. The Terms and Conditions prohibit the use or disclosure of EchoSpan's

27   "Confidential Information," defined as "all confidential and proprietary information of EchoSpan

28   disclosed to Client, whether orally or in writing, that is designated as confidential or that

23

1    reasonably should be understood to be confidential given the nature of the information [sic] and

2    the circumstances of disclosure, including, without limitation, pricing, business and marketing

3    plans, technology and technical information, product designs, and business processes." Dkt. 1-1 at

4    29, 37, Terms and Conditions ¶ 12(a).  EchoSpan admits at least some parts of its tool that can be

5    accessed in the free trial are not confidential, but nothing designates which parts are considered

6    confidential. Ex. C, EchoSpan Dep. at 107:25–109:19; Ex. F, McCall Dep. at 46:2–47:5.

7         Users are thus expected to guess that the features and functions and "the way they work"

8    is something that reasonably should be understood to be confidential. But given that EchoSpan has

9    hours of videos, numerous screenshots, and products guides detailing the same functions *and* "the

10   way they work," any reasonable user would believe these things are *not* confidential. EchoSpan

11   easily could have drafted the Terms and Conditions to include features and functions it believes

12   are confidential or have designated certain features and functions within the tool as confidential.

13   Its failure to do so makes even the Terms & Conditions (which in any event do not even apply to

14   all users) an inadequate measure to protect the purported secrecy of the information. For this reason

15   too, Medallia is entitled to summary judgment.

16        **iv.   EchoSpan's alleged trade secrets lack independent economic value.**

17        EchoSpan has not produced any evidence of any alleged trade secret's actual or potential

18   independent economic value derived from its secrecy. It is EchoSpan's burden to present evidence

19   that each of the alleged trade secrets has independent economic value because of its purported

20   secrecy. *Agency Solutions*, 819 F. Supp. 2d at 1017. Its failure to meet that burden requires

21   summary judgment in Medallia's favor.

22        With respect to the GTSA, Georgia law is clear that the alleged economic value must be

23   derived *as a result of* its secrecy. *See Capital Mgmt., LLC v. Wells Cap., Inc.*, 714 S.E.2d 393, 395

24   (Ga. App. 2011). That a feature of EchoSpan's E360 tool may have some economic value, based

25   on general company revenue or sales for example, is insufficient. There must be "economic value

26   to [plaintiff] in *maintaining the secrecy*, if any," of the alleged trade secret information. *Id.*

27        The DTSA imposes the same requirement. In a recent Fourth Circuit decision that affirmed

28   summary judgment for the defendant on a DTSA claim based on the plaintiff's failure to establish

1   independent economic value, the court rejected both the acquisition price and revenues derived

2   from licensing "because that evidence does not reflect that the alleged trade secrets had value nor

3   prove that any such value derived from their secrecy." *Synopsys, Inc v. Risk Based Sec., Inc.*, 70

4   F.4th 759, 771 (4th Cir. 2023). As the court explained, "[n]ot everything with commercial value

5   constitutes a trade secret," and the plaintiff has the burden to prove "a specific connection between

6   value and secrecy." *Id.* at 772. In short, "[p]roof of value untethered to value derived from secrecy

7   does not show an alleged trade secret's independent economic value." *Id.* Here, there is no

8   evidence as to *any* alleged trade secret's independent economic value based on its purported

9   secrecy. For that reason alone, Medallia is entitled to summary judgment.

10      **2. None of EchoSpan's alleged trade secrets were used to develop Medallia's tool.**

11      Even if any information at issue is a trade secret, EchoSpan has no evidence that Medallia

12   used such information to create its solution. In other words, it has no evidence of misappropriation.

13   "[A] defendant is liable for the misappropriation of a trade secret only if the plaintiff can show that

14   the defendant (1) disclosed information that enabled a third party to learn the trade secret or (2)

15   used a 'substantial portion' of the plaintiff's trade secret to create an improvement or modification

16   that is 'substantially derived' from the plaintiff's trade secret. On the other hand, if the defendant

17   independently created the allegedly misappropriated item with only 'slight' contribution from the

18   plaintiff's trade secret, then the defendant is not liable for misappropriation." *Penalty Kick Mgmt.

19   Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) (addressing GTSA).

20      Here, Ms. Kapnadak was adamant in her undisputed testimony that neither she nor anyone

21   else used anything found in the trial to develop Medallia's tool. Instead, there was not even a

22   "slight" contribution from the free trial as Medallia's development was "one hundred percent"

23   based on Bank of America's detailed requirements. EchoSpan has no evidence to the contrary.

24   There are no logs of what Ms. Kapnadak or others did or viewed in the free trial. And while

25   EchoSpan's technical expert witness ██████████████████████████████

26   ████████████████████████, in each case the same function can be found

27   on either EchoSpan's website and YouTube videos or ████████████████ (or both).

28      Nor is there evidence that any information disclosed in the acquisition discussions was

25

misappropriated. There is no evidence that any such information was disclosed to anyone at Medallia outside the deal team or that the information was used for any purpose other than to evaluate EchoSpan as a potential acquisition opportunity. All the evidence is to the contrary. Furthermore, EchoSpan cannot even point to a way that any such information could have been helpful to Medallia. For example, while early on EchoSpan accused Medallia of misappropriating its financial and pricing information to steal ███████████'s business, EchoSpan has abandoned that theory in the face of the undisputed evidence that Medallia submitted its RFP response and won the RFP well before Medallia had any contact with EchoSpan (in addition to the bank already being a longstanding customer of Medallia's)—making it impossible for Medallia to have used anything obtained in the acquisition discussions to assist in obtaining ███████████'s business.

Furthermore, as to Alleged Trade Secret Nos. 1, 3, 7, and 8 (the "███████████," "███████," "███████████," and "███████████████"), the evidence is undisputed that ███████████████████████████████████████████████████████████████████. Ex. B, Bank Dep. at 144:25–145:14, 146:12–20, 147:16–22. At the very least, Medallia is entitled to partial summary judgment as to these alleged trade secrets. Nor is there evidence that any of the other alleged trade secrets were misappropriated. EchoSpan has no evidence that Ms. Kapnadak or others accessed any of the alleged trade secrets when accessing the free trial. Ex. C, EchoSpan Dep. at 91:16–92:6; Ex. F, McCall Dep. at 144:20–148:25. Its entire case is based on speculation that because the free trial was accessed, each of the alleged trade secrets were necessarily used in developing Medallia's E360 solution. Without additional evidence, EchoSpan fails to create a question of fact as to misappropriation.

While circumstantial evidence of misappropriation is permissible, rank speculation is not, and the circumstantial evidence still must support a reasonable inference that the trade secret at issue was misappropriated. *See M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867 (N.D. Cal. 2019) (granting summary judgment where plaintiff "fail[ed] to present sufficient evidence to allow a reasonable fact finder to decide in its favor because its claims rely on speculation rather than evidence and inference"); *Allergan, Inc. v. Merz Pharm., LLC*, No. SACV 11-446 AG (EX), 2012 WL 13134616 (C.D. Cal. Feb. 1, 2012) ("Use of trade secrets 'need not be

direct, but may be circumstantial, as long as the evidentiary inferences to be drawn are reasonably deductible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork.'" (internal quotations omitted)).

Under the GTSA, circumstantial evidence is permissible, but only if it "*demands* an inference that trade secrets were used or disclosed." *HCC Ins. Holdings, Inc. v. Flowers*, 237 F. Supp. 3d 1341, 1352 (N.D. Ga. 2017) (emphasis added) (granting summary judgment where plaintiff presented merely circumstantial evidence of misappropriation). But "a finding of fact that may be inferred from, but is not demanded by, circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists, provided that the circumstantial evidence may be construed consistently with the direct evidence." *Id.* Accordingly, under the GTSA, "if the circumstantial evidence is consistent with the defendant's direct evidence—that is, if it does not contradict the direct evidence—there is no dispute of fact sufficient to deny the defendant a grant of summary judgment." *Id.* at 1353; *see also Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F. Supp. 3d 1305, 1318 (N.D. Ga. 2014), ("Circumstantial evidence, consisting of the product similarities suggested by Plaintiff, is not sufficient to support that there exists a genuine dispute of material facts over whether Defendant misappropriated Plaintiff's trade secrets."), *vacated on other grounds*, Case No. 14-12502 (11th Cir. Feb. 2, 2015).

Here, where many of the features alleged to be trade secrets are not even in Medallia's tool and others are specifically in ████████████████, the mere access of the free trial without more is insufficient to show that Medallia used any alleged trade secret. *See, e.g.*, Ex. B, Bank Dep. at 145:15–146:11, 146:21–147:4 (stating that "████████████████████████ ██████████████████████████████████████████). As there is no evidence that Medallia used any information from the free trial or the acquisition discussions—and no circumstantial evidence is inconsistent with the direct evidence that Medallia's development of its E360 solution was based entirely on the bank's requirements—EchoSpan's trade-secret claims fail as a matter of law.

### 3.  The GTSA does not apply extraterritorially.

While the above bases for summary judgment equally apply to the DTSA and GTSA

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

claims, the GTSA claim fails for another independent reason: the GTSA does not apply extraterritorially. The only state-law trade-secret claim EchoSpan asserts is one under the *Georgia Trade Secrets Act*. Dkt. 1-1 ¶¶ 120–27. The transfer of this case to California did not somehow transform, without any amendment, EchoSpan's claim to one under a similar California statute. If EchoSpan wanted to assert a claim under California's Uniform Trade Secrets Act, or any claim under California law, it could have amended its complaint to do so. It chose not to, even after Medallia asserted the GTSA's non-extraterritorial application as an affirmative defense. Dkt. 117 at 8. EchoSpan must sink or swim based on the claims it chose to allege.

EchoSpan's claim under the GTSA fails as a matter of law because the GTSA does not apply outside Georgia. Georgia courts have expressly held that "our statutory law has no extra-territorial operation." *Ohio S. Exp. Co. v. Beeler*, 140 S.E.2d 235, 236 (Ga. App. 1965). "Georgia statutes have a presumption against extraterritorial application. Thus, absent a clear statement to the contrary, the Georgia courts refrain from applying statutes extraterritorially." *Auld v. Forbes*, 848 S.E.2d 876, 881 (Ga. 2020) (quoting *Glock v. Glock*, 247 F.Supp.3d 1307, 1318 (N.D. Ga. 2017)). The GTSA contains no statement providing for extraterritorial application.

Here, EchoSpan does not allege nor have evidence of any act of Medallia occurring in Georgia. Ms. Kapnadak did all her work from Virginia. Ex. K, Kapnadak Dep. (Vol. I) at 48:12–22, 49:16–19; Ex. J, Kapnadak Dep. (Vol. II) at 277:7–15. While EchoSpan is headquartered in Georgia, the trial of its E360 tool was hosted on servers in Dallas, Texas, so EchoSpan cannot even argue that accessing its free trial somehow created a contact into Georgia. Ex. C, EchoSpan Dep. at 129:3–10, 309:7–12; Comp. Ex. R, EchoSpan's Am. Interrog. Resp. ¶ 19, and Verification. To be sure, EchoSpan is not aware of *any* conduct that occurred in Georgia related to its claims against Medallia. Ex. C, EchoSpan Dep. at 310:4–11. Because states generally cannot regulate conduct outside their borders—especially nonresidents with no connection to the state—any claim against Medallia under a Georgia statute, including the GTSA, fails as a matter of law.

**B. The Copyright Act preempts EchoSpan's state-law claims.**

The Copyright Act preempts state-law claims that seek to enforce rights equivalent to the Copyright Act's exclusive rights. 17 U.S.C. § 301(a). Two conditions must be met for copyright

28

preemption to apply: (1) "the 'subject matter' of the state law claim falls within the subject matter of copyright" and (2) "the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006) (footnotes omitted).

The subject matter of EchoSpan's state-law claims unquestionably falls within the subject matter of copyright. While a work need only be "within the subject matter of copyright" for preemption to apply, and need not meet the requirements for copyright protection, here it is undisputed that EchoSpan obtained copyright protection for its entire software tool, including every page of the free trial. Ex. C, EchoSpan Dep. at 56:3–57:4, 107:1–18. And it is well established that computer programs in general fall within the subject matter of copyright. *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989), *overruled on other grounds as stated in Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011).

Next, the rights asserted under state law for both the breach of contract and GTSA claims are equivalent to the rights contained in 17 U.S.C. § 106. "To satisfy the 'equivalent rights' part of the preemption test the alleged misappropriation must be equivalent to rights within the general scope of copyright as specified by section 106 of the Copyright Act," such as "the exclusive rights of reproduction, preparation of derivative works, distribution, and display." *Laws*, 448 F.3d at 1143 (citation and ellipses omitted). To avoid preemption, "the state cause of action must protect rights which are qualitatively different from the copyright rights," meaning that the state-law claim "must have an extra element which changes the nature of the action." *Id.* at 1143–44. However, a state-law claim will not avoid preemption merely by requiring an additional element not required under copyright; the extra element must be one that "changes the nature of the action" such that it affords the plaintiff rights that are "different in kind" from those protected under the Copyright Act. *Id.* at 1144. In other words, "[t]he extra element must transform the nature of the action." *Id.*

In analyzing this issue, a "court should not rely merely on a 'laundry list' of the alleged "elements" of the state law claims at issue, such that the mere *possibility* of an 'extra element' protects a claim from preemption." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001), *aff'd in part, dismissed in part*, 90 F. App'x 496 (9th Cir. 2003). Instead, a "court

29

should engage in a fact-specific inquiry into the actual allegations underlying the claims at issue in the case, so as to determine whether the 'gravamen' of the state law claim asserted is the same as the rights protected by the Copyright Act." *Id.* Accordingly, "the question is whether the state law claims *as they are asserted* are 'equivalent' to a federal copyright claim." *Id.*

A breach of contract claim will be preempted when it is "redundant because the additional elements do not afford plaintiff rights that are 'different in kind' from those protected by the copyright laws." *Laws*, 448 F.3d at 1144 (citation and ellipses omitted); *see also Ass'n for Info. Media & Equip. v. Regents of the Univ. of Cal.*, No. 2:10-CV-09378-CBM, 2012 WL 7683452, at *10 (C.D. Cal. Nov. 20, 2012) (holding that Copyright Act preempted breach of contract claim); *Taylor v. Universal Music Corp.*, No. CV1207507RGKAJWX, 2013 WL 12136369, at *2 (C.D. Cal. Mar. 19, 2013) (holding that Copyright Act preempted claim for breach of implied contract that was "ultimately based on an alleged promise not to use the creative works without compensating Plaintiffs"); *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457 (6th Cir. 2001) ("If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted."). Likewise, a claim premised on "unauthorized reproduction" of copyrighted material is preempted. *Laws*, 448 F.3d at 1144.

Similarly, a state-law claim for trade-secret misappropriation is preempted where the materials at issue are within the "subject matter" of copyright and the only "misappropriation" is based on the defendant's alleged *use* rather than *disclosure* of the plaintiff's alleged trade secret. *See Idema*, 162 F. Supp. 2d at 1194–95. A claim based on *disclosure* of a trade secret will not be preempted because a claim based on disclosure of secret information such that the disclosure itself undermines its value is qualitatively different from a copyright claim. *See id.* However, a claim based on *use* of the plaintiff's trade secret cannot be asserted "without treading on the exclusive domain of copyright." *Id.*; *see also Mktg. Info. Masters, Inc. v. Bd. of Trs. of Cal. State Univ. Sys.*, 552 F. Supp. 2d 1088, 1098 (S.D. Cal. 2008) (holding that Copyright Act preempted trade-secret misappropriation claim based on use rather than disclosure).

The Copyright Act preempts EchoSpan's breach of contract claim because it seeks to enforce an alleged promise not to copy, which is equivalent to an exclusive right within the general

scope of copyright. EchoSpan seeks to enforce a contract not to reproduce or make derivative use of its software. That is qualitatively the same as a copyright claim. Because EchoSpan seeks to enforce a right equivalent to rights within the general scope of copyright in a work that comes within the subject matter of copyright, the Copyright Act preempts the breach of contract claim.

EchoSpan's GTSA claim is likewise preempted because it is based on alleged copying of EchoSpan's software or creating a derivative product. EchoSpan does not allege that Medallia disclosed its supposed trade secrets to anyone. Rather, it alleges that Medallia misused the software by reverse engineering it or creating its own software as a derivative work. This too is essentially a disguised copyright claim and is therefore preempted and subject to summary judgment.

**C. EchoSpan's claim for breach of contract fails as a matter of law.**

**1. The Terms and Conditions are not binding on Medallia.**

The Terms and Conditions are not binding on Medallia. They can bind Medallia only if Ms. Kapnadak had actual or apparent authority to agree to them on Medallia's behalf. Based on the undisputed facts, she had neither. While the parties dispute whether Ms. Kapnadak was instructed by her manager to sign up for the free trial, it is undisputed that her manager told her not to misrepresent anything in EchoSpan's form. It is undisputed that Ms. Kapnadak clicked a radio button indicating—and misrepresenting—that her purpose in signing up for the trial was to evaluate it for internal use with employees at her organization. Therefore, her signing up for the free trial was outside any actual authority she had. Ms. Kapnadak also admitted that she never spoke to her manager or anyone else about the Terms and Conditions. And she never received any authorization to agree to any Terms and Conditions on behalf of Medallia. Authority to sign up for the free trial does not equate to authority to bind Medallia to any contract.

Ms. Kapnadak also lacked apparent authority. "Apparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has . . . . Where there were no manifestations of authority by the principal to a third party, apparent authority is not in issue." *Bresnahan v. Lighthouse Mission, Inc.*, 496 S.E.2d 351, 354 (Ga. App. 1998).[6] Here, when allowing the trial access, EchoSpan obtained no information about Ms. Kapnadak other than her

---

[6] Georgia law governs the Terms and Conditions. Dkt. 1-1 at 29, Terms and Conditions ¶ 1.

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

Medallia email address and that Medallia was a real company. Ex. F, McCall Dep. at 91:1–92:23. That alone is insufficient to cloak her with apparent authority to agree to the Terms and Conditions on Medallia's behalf. *See CSX Transp., Inc. v. Recovery Express, Inc.*, 415 F. Supp. 2d 6, 11 (D. Mass. 2006) ("Granting an e-mail domain name, by itself, does not cloak the recipient with carte blanche authority to act on behalf the grantee. Were this so, every subordinate employee with a company e-mail address—down to the night watchman—could bind a company to the same contracts as the president. This is not the law."). Also, the Terms and Conditions state they "constitute a binding legal agreement between *you* and EchoSpan, Inc." Dkt. 1-1 at 29 at 1 (emphasis added). EchoSpan admits that "you" means the individual clicking the log-in button. Ex. C, EchoSpan Dep. at 66:6–23, 109:24–110:6. Accordingly, the Terms and Conditions never applied to Medallia and any claim against Medallia for breaching them fails as a matter of law.

### 2. The parties' NDA supersedes the Terms and Conditions.

While Medallia denies agreeing to the Terms and Conditions, even if they could bind Medallia, EchoSpan's claim for breach of contract fails as a matter of law. The parties entered into the NDA three months after any potential agreement on the Terms and Conditions. The NDA's plain language supersedes all prior agreements between the parties with respect to the subject matter of the NDA. *See* Ex. V, NDA ¶ 13 ("This Agreement supersedes all prior discussions and writings and constitutes the entire agreement between the parties with respect to the subject matter hereof."). The subject matter of the NDA is the parties' confidential information. The NDA's main substantive provisions govern the definition, use, disclosure, and term of confidential information, as well as exclusions to what is considered confidential information and the return or destruction of such information. *Id.* ¶¶ 1–6. Accordingly, the NDA supersedes any prior agreement related to confidential information, including the Terms and Conditions.

Importantly, before this case was transferred, the Northern District of Georgia held that the NDA supersedes the Terms and Conditions. Its order transferring this case to this Court was based on its finding that the NDA's entire-agreement clause "a clear indication that the parties intended the later-executed NDA to replace any prior agreements and govern the parties' relationship as it relates to the exchange of confidential information." Dkt. 60 at 7. As a result, the court transferred

1    the case based on the NDA's forum-selection clause. Under the law of the case doctrine, this Court

2    must follow that decision. *See Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2014 WL 246972,

3    at *3–4 (N.D. Cal. Jan. 22, 2014) (explaining that "[f]ederal courts routinely apply law-of-the-case

4    principles to transfer decisions of coordinate courts" and "the policies supporting the doctrine

5    apply with even greater force to transfer decisions than to decisions of substantive law").

6          Here, EchoSpan's breach of contract claim is based solely on the superseded Terms and

7    Conditions. It chose not to bring a claim under the NDA. Under the applicable Georgia law, the

8    NDA not only supersedes the Terms and Conditions, but also acts as a novation and *discharges*

9    them (to the extent they were a valid contract between the parties in the first place). *See Hennessy

10   v. Woodruff*, 82 S.E.2d 859, 861 (Ga. 1954) ("An existing contract is superseded and discharged

11   whenever the parties subsequently enter upon a valid and inconsistent agreement, completely

12   covering the subject-matter which was embraced by the original contract."); *Powell v. Norman

13   Elec. Galaxy, Inc.*, 493 S.E.2d 205, 207 (Ga. App. 1997) ("The January 1992 lease represented a

14   novation extinguishing the original lease. An existing contract is superseded and discharged

15   whenever the parties subsequently enter upon a valid and inconsistent agreement completely

16   covering the subject matter embraced by the original contract." (internal quotation marks

17   omitted)). Therefore, Medallia is entitled to judgment as a matter of law on EchoSpan's breach of

18   contract claim, which is predicated solely on the superseded and discharged Terms and Conditions

19   (to the extent they constitute a contract between EchoSpan and Medallia).

20         **3.  There was no breach of the Terms and Conditions.**

21         Even if the Terms and Conditions applied, they were not breached. The provision at issue

22   applies to the use of "Confidential Information" as defined in the Terms and Conditions.

23   "Confidential Information is defined as "all confidential and proprietary information of EchoSpan

24   disclosed to Client, whether orally or in writing, *that is designated as confidential or that

25   reasonably should be understood to be confidential given the nature of the informatio [sic] and

26   the circumstances of disclosure*, including, without limitation, pricing, business and marketing

27   plans, technology and technical information, product designs, and business processes." Dkt. 1-1 at

28   29, 37, Terms and Conditions ¶ 12(a) (emphasis added). It is undisputed that the first part of the

33

1    definition is inapplicable; nothing was "designated as confidential" within the tool. Thus,

2    EchoSpan must rely on the "reasonably should be understood to be confidential given the nature

3    of the informatio [sic] and the circumstances of disclosure" definition.

4         For the same reason that the features at issue are not trade secrets, they are not

5    "Confidential Information." As discussed above, all the features at issue are publicly available. If

6    they are publicly available, then they cannot be "reasonably . . . understood to be confidential given

7    the nature of the informatio [sic] and the circumstances of disclosure." Indeed, under the governing

8    Georgia law, a party may enforce a confidentiality agreement "only to protect information that

9    actually is confidential." *Cellofoam N. Am. Inc. v. Kustes*, No. 1:19-CV-2159-MHC, 2021 WL

10   9274549, at *8 (N.D. Ga. Dec. 21, 2021). And even if a small part of the free trial was used and is

11   not publicly disclosed (of which there is no evidence), the wealth of information that is publicly

12   available is part of the circumstances that would lead a reasonable person to believe that none of

13   the features in the free trial are confidential. There is also no evidence in the record that Ms.

14   Kapnadak or anyone else at Medallia "reasonably understood" anything in EchoSpan's tool to be

15   confidential given the nature of the information and circumstances of the disclosure, particularly

16   given the copious information EchoSpan placed in the public domain about its tool.

17        Therefore, the Terms and Conditions were not breached as a matter of law.

18   **D.  Any damages must be capped at $0.00.**

19        Even if EchoSpan could conjure a question of fact on liability (it cannot), the Court should

20   still enter partial summary judgment on damages. The Terms and Conditions, which EchoSpan

21   drafted, contain a "Limitation of Liability" provision stating that "either party's aggregate

22   cumulative liability to the other party, in connection with these Terms and Conditions and the

23   Hosted Services shall not exceed the total amount paid by client to EchoSpan for Hosted Services

24   in the most recent twelve (12) months." Dkt 1-1 at 29, 39, Terms and Conditions ¶ 15. So even if

25   the Terms and Conditions are binding on Medallia, any damages for any of EchoSpan's claims are

26   capped at the total amount Medallia paid EchoSpan in the twelve months before January 13, 2021.

27   That amount is $0.00. Ex. C, EchoSpan Dep. at 110:17–111:15. Notably, this applies to *all* of

28   EchoSpan's claims because all are "in connection with . . . the Hosted Services." As a matter of

34

1   law and the plain language that EchoSpan drafted and chose to impose unilaterally on those

2   obtaining a trial access, any damages for EchoSpan's claims are capped at $0.00.

3   **E. EchoSpan cannot claim damages based on its loss of the ██████ relationship.**

4          Even if the Court does not grant summary judgment on the trade-secret claims, it should

5   still grant partial summary judgment on the issue of damages related to EchoSpan's loss of ██

6   ████████ as a customer. Any damages require causation. *See Norsat Int'l, Inc. v. B.I.P. Corp.*,

7   No. 12CV674-WQH-NLS, 2014 WL 2453034, at *8 (S.D. Cal. May 30, 2014). The largest

8   component of EchoSpan's damages calculation is based on the premise that EchoSpan's loss of

9   ████████ as a customer was caused by Medallia's alleged misconduct. But it is undisputed

10  that—for reasons having nothing to do with Medallia—EchoSpan decided to not respond to ██

11  ████'s RFP. The ████ was clear that ████████████████████████████

12  ████████████. Thus, regardless of any alleged misconduct by Medallia, EchoSpan was going

13  to lose the ████ as a customer. Indeed, ████████████████████████████

14  ████████████████████. Accordingly, regardless of

15  any action of Medallia, EchoSpan would have lost the ████ business. So, as a matter of law, any

16  damages arising from EchoSpan's loss of the ████ as a customer cannot be attributed to Medallia.

17  **F. The Court should grant Medallia summary judgment on its counterclaim.**

18         EchoSpan undisputedly breached the parties' NDA. The NDA defines "Confidential

19  Information" to include "the terms and conditions of this Agreement and the existence of the

20  discussions between the parties." Ex. V, NDA ¶ 1. The "discussions" are the discussions about

21  Medallia's potential acquisition of EchoSpan. After learning that it lost ████████'s

22  business to Medallia, EchoSpan ████████████████████████████

23  ████████████████████████. *See* Ex. BB, Email from J.

24  Vance to ████████ (July 15, 2021) (EchoSpan Dep. Ex. 39). As EchoSpan undisputedly

25  breached the NDA, the Court should enter partial summary judgment on liability.

26  **IV. CONCLUSION**

27         For these reasons, the Court should grant summary judgment in Medallia's favor.

28

Defendant's Motion for Summary Judgment – Case No. 5:22-CV-01732-NC

Dated: July 17, 2023

Respectfully submitted,

BERMAN FINK VAN HORN P.C.

By:   */s/ Benjamin I. Fink*
      Benjamin I. Fink
      Jeremy L. Kahn

MAURIEL KAPOUYTIAN WOODS LLP
      Marc J. Pernick
      Jason R. Bartlett

*Attorneys for Defendant/Counter-Plaintiff Medallia, Inc.*

36