LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (CA Bar No. 266966)
eburbidge@lewisllewellyn.com
Zachary C. Flood (CA Bar No. 312616)
zflood@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

COUNCILL, GUNNEMANN & CHALLY, LLC
Jonathan R. Chally (GA Bar No.141392); *Pro Hac Vice*
jchally@cgc-law.com
Jennifer R. Virostko (GA Bar No. 959286); *Pro Hac Vice*
jvirostko@cgc-law.com
Joshua P. Gunnemann (GA Bar No. 152250); *Pro Hac Vice*
jgunnemann@cgc-law.com
1201 W. Peachtree Street NW, Suite 2613
Atlanta, Georgia 30309
Telephone: (404) 407-5250
Facsimile:   (404) 600-1624

Attorneys for Plaintiff
ECHOSPAN, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECHOSPAN, INC.,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>MEDALLIA, INC.,<br><br>Defendant/Counter-Plaintiff. | Case No. 5:22-cv-01732-NC<br><br>**ECHOSPAN, INC.'S RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR**<br><br>Date:      April 3, 2024<br>Time:     11:00 a.m.<br>Ctrm:     5<br>Judge:    Hon. Nathanael M. Cousins |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT AND AUTHORITY ................................................................................ 1

I.     RULE 50(B)'S DEFERENTIAL STANDARD PERMITS JUDGMENT AS A MATTER OF LAW ONLY WHEN THERE IS NO EVIDENTIARY BASIS FOR THE JURY'S VERDICT. ........................................................... 1

II.    MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS JUDGMENT FOR THAT OF THE JURY ON LIABILITY ................................ 2

     A.    Trade Secret 6 Was Properly Identified. ..................................... 3

     B.    Trade Secret 6 Is A Secret. ......................................................... 5

          1.    EchoSpan Introduced Evidence of The Secrecy of Trade Secret 6. ............................................................... 5

          2.    Medallia's Selective Recitation of Only Its Own Evidence Is Not Grounds to Grant Its Motion. ................... 6

     C.    EchoSpan Took Reasonable Measures to Maintain The Secrecy of Trade Secret 6. ...................................................................... 9

     D.    Trade Secret 6 Has Independent Value Based On Its Secrecy. ................. 11

III.   MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS JUDGMENT FOR THAT OF THE JURY ON DAMAGES ............................. 12

     A.    Medallia's Head Start Is Supported by Evidence. ...................................... 12

     B.    The Jury's Allocation Of Unjust Enrichment to Trade Secret 6 Was Supported By Evidence. ......................................................... 14

          1.    Fact and Expert Testimony Supported The Jury's Allocation of Damages to Trade Secret 6. ...................................... 15

          2.    Apportionment Is Not Required To Determine Enrichment From Misappropriation Of Unified Systems. ............................... 18

          3.    Medallia's Argument That Trade Secret 6 Must Control Other Trade Secrets Is Incorrect. ........................................... 19

IV.   MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS JUDGMENT FOR THAT OF THE JURY ON THE EXTENT OF MEDALLIA'S UNJUST ENRICHMENT .......................................................... 20

     A.    Evidence Supports the Conclusion That Medallia Was Unjustly Enriched By Its Misappropriation. ...................................... 20

     B.    The Evidence Supports the Amount of Unjust Enrichment Awarded. ..... 21

i

C.      There Is Overwhelming Evidence Of Medallia's Willful And Malicious Misappropriation and Willful, Wanton, or Grossly Negligent Breach of the Terms and Conditions. ......................................22

V.      THE JURY'S EXEMPLARY DAMAGES AWARD IS APPROPRIATE. .........25

VI.     MEDALLIA IS NOT ENTITLED TO A NEW TRIAL OR REMITTITUR. ......25

A.      The Unjust Enrichment Award Is Not Excessive ....................................26

B.      The Exemplary Damages Award Is Not Excessive .................................26

C.      There Are No Grounds For Remittitur .....................................................28

CONCLUSION .................................................................................................................29

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

4    *2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
        399 F. Supp. 2d 1064 (N.D. Cal. 2005)............................................................................19

5

6    *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
        738 F.3d 960 (9th Cir. 2013)........................................................................................2

7    *Alifax Holding Spa v. Alcor Sci. Inc.*,
        404 F. Supp. 3d 552 (D.R.I. 2019)................................................................................21

8

9    *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
        663 F.3d 966 (8th Cir. 2011)........................................................................................9

10

11   *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
        331 F. Supp. 3d 977 (N.D. Cal. 2018)...........................................................................18

12   *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
        53 F.4th 368 (6th Cir. 2022)..........................................................................4, 5, 14, 16

13

14   *Comet Techs. USA Inc. v. XP Power LLC*,
        No. 20-CV-06408-NC; 2023 WL 3569838 (N.D. Cal. Mar. 22, 2023)................................2

15

16   *Costa v. Desert Palace, Inc.*,
        299 F.3d 838 (9th Cir. 2002)........................................................................................1

17

18   *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
        95 F.3d 1422 (9th Cir. 1996).......................................................................................25

19   *Diamond Power Int'l, Inc. v. Davidson*,
        540 F. Supp. 2d 1322 (N.D. Ga. 2007)...........................................................................9

20

21   *DUSA Pharms., Inc. v. Biofrontera Inc.*,
        2020 WL 5995979 (D. Mass. Oct. 9, 2020)....................................................................10

22

23   *Fenner v. Dependable Trucking Co., Inc.*,
        716 F.2d 598 (9th Cir. 1983).......................................................................................26

24

25   *InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
        978 F.3d 653 (9th Cir. 2020)........................................................................................3

26   *Masimo Corp. v. Apple Inc.*,
        No. SACV2000048JVSJDEX, 2023 WL 5506012 (C.D. Cal. Aug. 7, 2023)........................4

27

28   *Mattel, Inc. v. MGA Ent., Inc.*,
        801 F. Supp. 2d 950 (C.D. Cal. 2011)...........................................................................28

iii

*Monster Energy Co. v. Vital Pharms., Inc.*,
  No. EDCV181882JGBSHKX, 2022 WL 17218077 (C.D. Cal. Aug. 2, 2022) .................. 18

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
  659 F. Supp. 3d 138 (D. Mass. 2023) ................................................................................... 18

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................................................... 2

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ............................................................................................................. 26

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.,  (LGS)*,
  2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021) ................................................................ 27, 28

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  546 U.S. 394 (2006) ............................................................................................................. 26

*Versata Software, Inc. v. Ford Motor Co.*,
  2023 WL 3175427; No. 15-CV-10628; 2023 WL 8622001 (E.D. Mich. May 1, 2023) ...... 19

*Winarto v. Toshiba Am. Elecs. Components, Inc.*,
  274 F.3d 1276 (9th Cir. 2001) ............................................................................................... 2

*WWMAP, LLC v. Birth Your Way Midwifery*,
  No. 5:23-CV-243-MJF 2024 WL 151411 (2024) ......................................................... 11, 12

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F3d 101 (2nd Cir. 2001) ................................................................................................. 2

**STATUTES**

18 U.S.C.
  § 1836(b)(3) .......................................................................................................................... 28
  § 1836(b)(3)(C) ............................................................................................................... 22, 25
  § 1839(3)(B) ......................................................................................................................... 19

Georgia
  Ga. O.C.G.A. 10.1.763(b) ..................................................................................................... 25
  Ga. O.C.G.A. 10.1.763(c) ..................................................................................................... 22

**FEDERAL RULES**

Federal Rules of Civil Procedure
  Rule 50(a) ............................................................................................................................... 2

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

**INTRODUCTION**

This Motion, a kitchen-sink attempt to seek reconsideration of the Court's prior rulings and the jury's findings in keeping with Medallia's unsuccessful scorched-earth litigation strategy, should be denied. Medallia repeats nearly every argument it has made at both summary judgment and at trial (indeed, many of which it never raised in a Rule 50(a) motion, as is required to find in its favor), and merely repeats the evidence it presented at those stages in the litigation. In every instance, however, Medallia fails to acknowledge—even to cite—the complete evidentiary record. That approach reveals the fundamental flaw in this Motion: Medallia, in effect, wishes away the trial and the jury's findings, but a challenge to the sufficiency of the evidence is not an opportunity to relitigate the jury's weighing of the evidence. Instead, at this stage of the litigation, the adverse jury verdict against Medallia cannot be disturbed unless there is no basis for the jury's conclusions. And, as to the issues in this litigation, that cannot be found. EchoSpan owned a trade secret, identified as Trade Secret 6. Medallia misappropriated Trade Secret 6 in its attempt to compete with EchoSpan in creating its own 360-degree review system, and its conduct was willful and malicious. It was unjustly enriched by this misappropriation. Each of these conclusions, reached by the jury, is supported by evidence, and none can be disturbed by Medallia's Motion.

**ARGUMENT AND AUTHORITY**

The Court has already rejected the arguments made in Medallia's Motion. Dkt. 373, Tr: 844:1-850:18, 1136:11-16 (denying Medallia's Rule 50(a) motion on identical grounds to those raised now). Dkts. 378 and 404. In denying Medallia's Rule 50(a) Motion, the Court determined that "a reasonable jury would have a legally sufficient evidentiary basis to find for [EchoSpan] on all claims." Dkt. 404. And the Court specifically found that "a reasonable jury could find Medallia acted willfully or wantonly based on the evidence in the record." Dkt. 378 at 8. Nothing about the evidence the Court relied on has changed or diminished since those rulings. Medallia's Motion should be denied.

**I.     RULE 50(B)'S DEFERENTIAL STANDARD PERMITS JUDGMENT AS A MATTER OF LAW ONLY WHEN THERE IS NO EVIDENTIARY BASIS FOR THE JURY'S VERDICT.**

The standard for a Rule 50(b) motion is "very high." *Costa v. Desert Palace, Inc.*, 299 F.3d

838, 859 (9th Cir. 2002), aff'd, 539 U.S. 90 (2003). Judgment as a matter of law following trial or verdict is permitted only where there is no legally sufficient evidentiary basis upon which a reasonable jury could have found for the non-moving party. Fed R. Civ. P. 50(a). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013). The district court must uphold the jury's verdict if there was any legally sufficient basis to support it. *Id. (emphasis added) (citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). As this Court has recognized, "a judgment as a matter of law is not about weaknesses, or even gaps, in a party's case." *Comet Techs. USA Inc. v. XP Power LLC*, No. 20-CV-06408-NC, 2023 WL 3569838, at *2 (N.D. Cal. Mar. 22, 2023) (Cousins, M.J.).

The Court may not to weigh evidence, *Reeves*, 530 U.S. at 150, make credibility findings, see *id.*, or substitute its judgment for that of the jury. *Id.* at 153; *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). Instead, the Court must disregard all evidence favorable to Medallia except evidence that the jury is required to believe (e.g., uncontroverted expert testimony on a subject that requires expert testimony). *Winarto*, 274 F3d at 1283. "This high hurdle recognizes that credibility, inferences, and factfinding are the province of the jury, not this court." *Costa*, 299 F.3d at 859. Medallia's motion must be denied unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F3d 101, 108 (2nd Cir. 2001) (emphasis added; internal quotes omitted).  Medallia has not met this high standard.

## II.     MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS JUDGMENT FOR THAT OF THE JURY ON LIABILITY.

Medallia doesn't even try to satisfy Rule 50's "very high" bar; in fact, Medallia does not describe the applicable standard beyond a single sentence of its 30-page brief. Rather than crediting only EchoSpan's evidence and drawing inferences only in EchoSpan's favor—as it was required to do—Medallia paints a picture of this case that is skewed entirely in its own favor and ignores

significant swaths of EchoSpan's evidence. Medallia's failure to tailor its motion to the governing

standard is fatal to its arguments, discussed, in turn, below.

### A.   Trade Secret 6 Was Properly Identified.

Medallia attempts to revive an already thrice-decided discovery dispute—the specificity of

Trade Secret No. 6.  A trade secret must be identified with "sufficient particularity" to separate it

from general or specialized knowledge in the trade and may not rely on "catchall" phrases or

categories. *InteliClear, LLC v. ETC Glob. Holdings, Inc*., 978 F.3d 653, 658 (9th Cir. 2020). As the

Court has already determined--three different times--this standard has been met. Dkts. 116, 322,

404.

EchoSpan provided its Supplemental Trade Secret Identification to Medallia in June 2022.

That disclosure described Trade Secret 6 as, "The design and organization of the user interface  of

the EchoSpan tool for managing complex projects. The user interface allows for the support of

multiple survey projects simultaneously and efficiently allows for management of those projects."

Dkt. 111-5. The Court found this disclosure sufficient, ruling in July 2022 that "[T]his Court

FINDS EchoSpan's trade secret disclosures sufficiently particular and ORDERS discovery to

commence." Dkt. 116. Medallia repeatedly requested that this Court reconsider its ruling, Dkt. 299,

which the Court rejected, Dkt. 322 ("This motion [seeking specificity as to trade secrets] is a

duplication of earlier discovery and summary judgment motions resolved by the Court.").

The evidence at trial provided even greater specificity as to Trade Secret 6. Mr. Vance,

EchoSpan's founder, testified that the "EchoSpan system [has a] design and organization for

managing projects," which had been identified as Trade Secret 6. Tr. 450:10-12; Dkt. 111-5. That

Trade Secret is "the administrative tool and its interaction with the end user's tool," or, put another

way, "the mechanisms" by which the end user's tool interacts with the confidential administrative

tool "in a protected way." Tr. 450:14-25. During a demonstration of the EchoSpan system, while

displaying this portion of the system, Mr. Vance again described Trade Secret 6 as "the

administrative system. . . its overall design, its overall organization." Tr. 487:18-488:3.

Mr. King, EchoSpan's lead developer, echoed Mr. Vance's description: "If you're saying

user interface to manage projects, then we're talking about the admin tool" -- "it is the guts of the

1    system." Tr. 912:25-913:12, 24 (consistent with EchoSpan's trade secret disclosure, describing that

2    user interface is the admin tool accessed through the Feedback Projects tab). This description is

3    entirely consistent with Mr. Vance's description of the trade secret given in his deposition, which

4    Medallia played at length at trial. There, Mr. Vance described that Trade Secret 6 is the "capability"

5    of the administrative side of the system that permits administrative users to create "multiple 360

6    degree feedback or performance review projects concurrently," which permits each concurrent

7    review to have "their own set of everything[:] users, review content, report templates, schedules."

8    Dkt. 431-8, Vance Depo. 422:20-423:14.

9        Medallia's Motion mentions none of this evidence.  But the jury heard all of it, and it is

10   substantial proof as to what exactly EchoSpan claimed to be a trade secret in Trade Secret 6, far

11   more than the minimum required to uphold the jury's verdict.  *See Caudill Seed & Warehouse Co.*

12   *v. Jarrow Formulas, Inc*., 53 F.4th 368, 382 (6th Cir. 2022) (affirming denial of Rule 50 and 59

13   motions to challenge of particularity of trade secret identification where plaintiff introduced

14   testimony describing the trade secret and explaining uniqueness of trade secret "at a level of depth

15   beyond merely listing technical concepts"); *Masimo Corp. v. Apple Inc*., No.

16   SACV2000048JVSJDEX, 2023 WL 5506012, at *3 (C.D. Cal. Aug. 7, 2023) (denying Rule 50(b)

17   motion concerning particularity of identification of trade secret) .

18       Documentary evidence supplements the testimony identifying Trade Secret 6. Most notable

19   is Exhibit 19, a spreadsheet created by Medallia product managers in which they copied significant

20   swaths of EchoSpan's Trade Secret 6 and strategized how to prioritize adding those settings to their

21   build for Bank of America. Ex. 19; 914:10-915:5 (King); 1076:2-17, 10771-6 (Vance) (columns A,

22   B, and C in Exhibit 19 reflects "a replication" of "the advanced setting page in the administrative

23   tool" of Trade Secret 6); Dkt, 432-5, Kapnadak Depo. II, 165:11-166:13; Tr. 371:15-21 (Khanna).

24   Through Exhibit 19, both Medallia's employees and the jury gained an understanding of what is

25   EchoSpan's trade secret.

26       Medallia, contrary to this extensive fact testimony at trial, argues that Trade Secret 6 could

27   not be, and was not, reflected in Exhibit 19. Mot. at 6-7. That is simply wrong as a factual matter,

28   and a prime example of Medallia failing to construe the evidence in the light most favorable to

EchoSpan, as Rule 50 requires., at trial the jury heard evidence that Exhibit 19 reflects settings from Trade Secret 6. Tr. 1076:16-17 (Vance). They also heard testimony that these settings reflect the "core of the administrative system" that is Trade Secret 6 and drive the EchoSpan system because they dictate how the remainder of the systems' capabilities "communicate[] with each other and drive their own functions." 1076:19-25 (Vance); Tr. 915:21-23 (King). This is precisely the type of evidence that one would expect the jury to seize on, and it is also the kind of trial evidence that has been deemed sufficient to defeat a Rule 50 challenge to the specificity of a trade secret. See Caudill Seed & Warehouse Co., 53 F.4th at 382 (relying, in part, on documentation of trade secret in denying Rule 50(b) challenge to sufficiency of identification of trade secret).

Removing any doubt as to error in the jury's finding on this issue is the Court's direct and specific instruction to the jury on the necessity of finding that Trade Secret 6 had been concretely identified, Dkt. 385 (Jury Instruction #16). With that instruction, and the evidence described above, Medallia's challenge to the sufficiency of EchoSpan's trade secret disclosure should be rejected for a fourth time.

### B.    Trade Secret 6 Is A Secret.

Next, Medallia raises the exact same arguments concerning the secrecy of Trade Secret 6 that Medallia raised at summary judgment. The Court considered and rejected those arguments months ago, and denied summary judgment because they raised facts for determination by the jury. Dkt. 222 at 16-19 (raising same arguments), Dkt. 275 at 3 (finding issues of fact). The jury considered that same evidence and found in EchoSpan's favor. Dkt. 389.

### 1.    EchoSpan Introduced Evidence of The Secrecy of Trade Secret 6.

Mr. Vance was explicit in his testimony at trial: the "design and organization for managing projects," identified as Trade Secret 6 is "competitively sensitive" and is a "secret." Tr. 450:10-451:5; see also 493:16-25 (echoing same). The evidence presented to the jury also established the security measures used to protect this trade secret. First, EchoSpan's president testified about the security requirements surrounding the authorization of trial access (including the "vet[ting]" process that each applicant undergoes, including researching the business associated with the request). Tr. 229:14-230:12, 230:19-25 (McCall); Ex. 8. Access is not granted to use EchoSpan's system unless

1   the user has agreed to the EchoSpan Terms and Conditions and its confidentiality requirements or

2   another, equally restrictive, non-disclosure agreement. Tr. 236:19-21 (McCall); Ex. 27 (Terms and

3   Conditions), § 19, 12; Tr. 455:13-17 ("[W]e don't let anyone touch the tool. . . unless they've

4   signed our terms and conditions or a similar confidentiality agreement." Next, EchoSpan's trade

5   secret is also protected internally by its employee confidentiality requirements and the

6   confidentiality policies set forth in its employee handbook. Tr. 462:14-463:10, 464:9-24; Exs. 12

7   (EchoSpan employee handbook), 32 (employment agreement containing confidentiality

8   obligations). In addition, EchoSpan's system is also protected by a series of hardware and software

9   safeguards that protects it from hackers. Tr. 460:9-10 (Vance); 911:3-16 (King) (describing security

10   tests performed for Bank of America). That is more than enough evidence for the jury to find in

11   EchoSpan's favor.

### 2.   Medallia's Selective Recitation of Only Its Own Evidence Is Not Grounds to Grant Its Motion.

14       In response, Medallia—again—does not even acknowledge the above testimony. It does not

15   discuss any of what EchoSpan relied on to prove Trade Secret 6's secrecy. Instead, it merely repeats

16   the arguments, relying on the same evidence, that it presented at summary judgment and asked the

17   jury to rely on to rule in its favor. The Court (at summary judgment) and the jury (at trial) rejected

18   these arguments. Re-hashing these disputes is not enough to overturn the jury's verdict.

19       Medallia claims, as it previously did in moving for summary judgment and at trial, that a

20   handful of outdated, "tightly curated" marketing videos for EchoSpan's product publicize Trade

21   Secret 6. Mot. at 6, -7, 8, 9, 10-11. The only evidence concerning these YouTube videos (as

22   opposed to post hoc attorney argument concerning them), was that they do not provide more than a

23   glimpse of the capabilities of Trade Secret 6. The Court rejected this contention in denying

24   Medallia's Motion for Summary Judgment (see Dkt. 222, raising this argument at 16; denied at Dkt.

25   275). The jury was presented with the same evidence and the same argument and, as to Trade Secret

26   6, similarly rejected it. Medallia dedicated substantial trial time to showing the videos it claims

27   publicize Trade Secret 6. There were nearly a dozen videos played, see Tr. 285:17, 286:1, 7,

28   287:19, 288:7, 19, 25, 598:8, 15, and Medallia argued that these YouTube videos revealed

1    EchoSpan's Trade Secret 6, Tr. 198:5-199:9, 1196:5-7. Medallia ensured the jury had access to

2    these videos in its deliberations. The jury found them inconsequential.

3          These videos simply do not stack up to the sweeping and unequivocal testimony EchoSpan

4    provided on the secrecy of Trade Secret 6. When confronted at trial with the very same evidence

5    that Medallia touted as to public disclosure (the same evidence on which it now relies), Mr. Vance

6    unequivocally addressed and rejected the issue. When asked whether these videos disclose what is

7    secret about Trade Secret 6, Mr. Vance testified: "Not in its totality, not even close." Tr. 598:2-5.

8    He further testified that the competitively sensitive features of this trade secret were not revealed.

9    Tr. 451:6-11 (Vance).

10         As explained multiple times, while in these videos, EchoSpan may "reveal the existence"

11   that it has certain features, it does not reveal how those features work. Tr. 451:6-11; 452:3-19

12   (Vance), 293:19-23 (McCall) (YouTube video does not permit user to experiment with settings);

13   1077:14-17 ("not the bulk of" advanced settings contained in Exhibit 19 are shown in YouTube

14   videos). The glancing screenshots visible in YouTube videos don't reveal how to use, or

15   manipulate, their functionality, which is the secret and competitively valuable component of the

16   system. Tr. 911:21-912:23 (King). In fact, EchoSpan's primary developer specifically testified that

17   a glimpse of the settings within Trade Secret 6 would not permit him to replicate EchoSpan's

18   system's functionality, but that access to the system, and the ability to use the system and operate

19   these settings (exactly what Medallia sought out and obtained) would allow it to develop a

20   competing system. Tr. 915:24-917:7 (King). And this functional ability of the features of Trade

21   Secret 6, "not just their existence," gives EchoSpan its competitive advantage. Tr. 455:1-9; 564:3-

22   13 ("The videos are not confidential, but they're curated in a way that we don't reveal the totality of

23   what's available."); 294:1-14, 566:25-567:1 (YouTube videos shown at trial are old product).

24         The evidence further demonstrated that the functionality of EchoSpan's system, by its very

25   nature, cannot be captured in the 30-minute YouTube video Medallia touted because it reflects the

26   interaction of hundreds of features in the system. Tr. 714:16-715:10 (Myers), 294:18-295:14

27   (McCall) (interactions of settings cannot be captured in 40-minute video). Despite Medallia's

28   repeated attempts to characterize these videos as a full disclosure of EchoSpan's tool, the evidence

7

1    showed they were merely, "marketing level videos" that "orient the user as to functionality" so that

2    they can "understand what they're getting" at a high level. Tr. 624:22-625:10. The videos do not

3    detail the intricacies of EchoSpan's trade secret. As EchoSpan's expert testified: the videos of

4    EchoSpan's system "[is] what I call a teaser," "it by no means is anything close to [gaining] access

5    to the actual tool where you can exercise it, turn on the switch, and see what it actually does." Tr.

6    664:22-665:7 (Myers). He further testified that the nature of EchoSpan's functionality could not be

7    captured in a 30-minute YouTube video due to its complexity. Tr. 714:16-20, 715:1-10 (Myers).

8        But, more importantly, Medallia's own lead product designer provided overwhelming

9    evidence rejecting the very same contention Medallia makes here. She testified that, having looked

10   at EchoSpan's website and YouTube videos, it was insufficient for her purposes, "I told [my boss]

11   this is all the information I got from the website and from the YouTube videos. . . and that I got

12   limited information from there. . . I don't think I can do this. . .. I told him there was an option for a

13   trial account, at which point he asked me to create it." Dkt. 431-3, Kapnadak Depo. II, 254:08-

14   255:03; see also Tr. 665:12-14 (Myers) ("If [publicly available videos] had provided all of the

15   information, Ms. Kapnadak could have spent one day watching all of those videos and she would

16   have been done."). It is hard to imagine more compelling evidence than an unqualified admission

17   from the Medallia employee tasked with developing a competing system. She viewed the same

18   videos and marketing materials Medallia now claims to reveal the entirety of Trade Secret 6; she

19   testified, even after reviewing all of that material, she still needed more; and she testified that she

20   could obtain more only through unfettered access to EchoSpan's system. The jury, having seen the

21   evidence and argument presented by Medallia, concluded that Trade Secret 6 was a secret. Dkt. 389

22   at 6. Medallia improperly ignores this evidence, but it is more than sufficient to support the jury's

23   verdict.

24       Relatedly, Medallia recycles its argument that software features—like what it claims Trade

25   Secret 6 to be—are not trade secrets when disseminated to users. Mot. at 7-8.  Medallia cites no

26   new evidence in support of this contention; it merely repeats what the Court earlier found

27   insufficient at summary judgment, (Dkt. 222 at 19-21), and what the jury found unconvincing at

28   trial. For the reasons set forth in EchoSpan's opposition to Medallia's summary judgment motion,

8

1   (Dkt. 237 at 17-19), and which the Court agreed with, (Dkt. 275), this argument should be rejected

2   yet again.

3       There is ample evidence supporting the jury's determination that Trade Secret 6 was a

4   secret. Medallia merely invites the Court to substitute an alternate interpretation of the evidence

5   presented, a result not permissible under Rule 50.

6       **C.   EchoSpan Took Reasonable Measures to Maintain The Secrecy of Trade Secret**

7       **6.**

8       Medallia also misleadingly claims that "the record does not support" the jury's conclusion

9   that EchoSpan took reasonable measures to protect its trade secret. Mot. at 9. "Reasonable efforts to

10  maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *AvidAir*

11  *Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011). And "[t]rade secret

12  protection is not destroyed by the 'usual situation' in which secret information is shared with

13  employees or other confidants who are legally obligated, by express or implicit agreement or by

14  another duty imposed by law, to maintain its secrecy." *Diamond Power Int'l, Inc. v. Davidson*, 540

15  F. Supp. 2d 1322, 1333 (N.D. Ga. 2007). As this Court has recognized, whether efforts to maintain

16  secrecy are reasonable is typically an issue of fact for resolution by the jury. Dkt. 275 at 4.

17      Medallia completely ignores extensive evidence regarding the measures EchoSpan

18  employed to protect Trade Secret 6. Medallia touts only a curated list of facts, while ignoring the

19  balance of evidence the jury actually heard. The evidence established that the only way to access

20  the full panoply of features of Trade Secret 6 is to access the full tool—access only granted to

21  specific admins at customers or to free trial users, all of whom are bound by EchoSpan's Terms and

22  Conditions or similar confidentiality agreements. Tr. 455:10-23; 459:14-18 (describing that users

23  must agree to EchoSpan's Terms and Conditions or, in the case of large institutional clients, non-

24  disclosure agreements), 470:23-471:4; 525:13-21 (describing how conditional trial access permits

25  user to see "the entire administrative tool"),  236:19-21 (McCall) (access is not granted to use

26  EchoSpan's system unless the user has agreed to the EchoSpan Terms and Conditions and its

27  confidentiality requirements). And the Terms and Conditions specifically and explicitly protect the

28  confidentiality of EchoSpan's system. Ex. 27, § 19; Tr. 467:10-19 (Vance).

1    The evidence also demonstrated both (1) that EchoSpan's employees were bound to keep its

2    proprietary information confidential under the terms of its internal policies and their employment

3    agreements, which specifically address the confidentiality of trade secrets; and (2) that EchoSpan

4    created hardware and software protections, including log-in controls, network firewalls, web

5    application firewalls, intrusion detection systems, and a professional hosting system, to protect

6    against hackers and other bad actors. Supra at 6; Tr. 567:9-10, 458:17-21. Any preview of

7    EchoSpan's system on its website, in YouTube video, or at a trade show has always been

8    intentionally circumscribed so as to show only a preview of EchoSpan's capabilities. Supra at 7-9;

9    Tr. 269:14-16, 293:5-18 (describing that at trade shows, EchoSpan performs only "a quick demo"

10   that does not reveal trade secrets).

11        The isolated evidence Medallia cites was rejected by the jury here. Moreover, that same

12   kind of evidence has been routinely rejected by other courts considering the same issues. While

13   some courts have found that a generic confidentiality agreement contained in an employment

14   agreement is insufficient protection as a matter of law,  more robust protections—including those

15   employed here, such as third-party NDAs, "IT controls," need-to-know restrictions, password

16   requirements, firewalls and internal monitoring—raise an issue of fact as to reasonableness that

17   must be resolved by a jury. *See DUSA Pharms., Inc. v. Biofrontera Inc.*, No. CV 18-10568-RGS,

18   2020 WL 5995979, at *2 (D. Mass. Oct. 9, 2020) (finding issue of fact as to reasonableness of

19   measures where the aforementioned controls protected claimed trade secrets). Similarly, this Court

20   has already rejected Medallia's arguments that individual users of institutional clients did not accept

21   the Terms and Conditions at sign-on and that the Terms and Conditions do not adequately identify

22   what is confidential. Mot. at 10; see Dkt. 222 at 23-24 (raising, unsuccessfully, same arguments in

23   summary judgment motion). And the Court has already recognized the shortcomings in Medallia's

24   challenge to the legal sufficiency of the contractual protections at issue here, including the efficacy

25   of its click-wrap Terms and Conditions. Mot at 11; see Dkt. 222 at 23 (raising, unsuccessfully, same

26   argument in summary judgment motion). The jury similarly heard—and rejected—Medallia's

27   argument that the contractual protections contained in the Terms and Conditions were insufficient.

28   Mot. at 11-12.

1    The jury was instructed on this element, Dkt. 385 at 11-12 (Closing Jury Instruction No. 19),

2    and, weighing the evidence, resolved this issue in EchoSpan's favor on Trade Secret 6. Dkt. 389 at

3    6. Medallia's Motion merely asks the Court to substitute its own judgment for that of the fact finder,

4    a result not permitted under Rule 50.

5         **D.    Trade Secret 6 Has Independent Value Based On Its Secrecy.**

6         Medallia is simply incorrect there was no evidence that Trade Secret 6 derives economic

7    value from its secrecy. Medallia first argues that source code is the only valuable element of a

8    software program, Mot. at 12, but that legal question has already been litigated and rejected. See

9    Dkt. 222 at 19-20 (raising the same argument in summary judgment); Dkt. 275 (denying summary

10   judgment). Even at trial, the Court recognized that "This is not a source code case," and rejected

11   Medallia's attempts to inject source code issues into the proceedings. Tr. 580:24-591:5.

12        Medallia next argues that Trade Secret 6 derives its value from its function rather than its

13   secrecy, absurdly suggesting that a trade secret cannot be functional or useful in addition to being

14   secret. Mot. at 12 (an argument not previously raised). Medallia is incorrect. The evidence

15   presented to the jury established that, if not kept secret, Trade Secret 6 would (and did) "afford

16   competitors an economic advantage" and would "lose economic value," and that it thus derived

17   value from its secrecy, not solely its functionality. *WWMAP, LLC v. Birth Your Way Midwifery*, No.

18   5:23-CV-243-MJF, 2024 WL 151411, at *3 (N.D. Fla. Jan. 10, 2024) (defining meaning of

19   "independent economic value" under DTSA). Indeed, the jury found that Medallia's use of the trade

20   secret benefitted it by $11.7 million.

21        As to the value of the secrecy of Trade Secret 6, the jury heard testimony that the software

22   trial Medallia accessed permitted it to "tak[e] 20 years of [EchoSpan's] work and [] hold it in [its]

23   hands and roll it around." Tr. 525:13-21. Over those twenty years, EchoSpan's developers have

24   spent "thousands of hours" developing its system. Tr. 574:22-575:1. The evidence further

25   established that because Trade Secret 6 is so important to the functionality of the system and it

26   permits the other components to function, it drives the commercial value of the system. Tr.

27   1078:24-1079:7, 1080:13-17; 1079:23-1080:3 (Vance). EchoSpan's lead developer echoed the

28   importance of Trade Secret 6 in driving the value of EchoSpan's system. "The admin tool is what

1    makes everything work," without it, "there's nothing that EchoSpan can deliver. Tr. 913:13-914:5

2    (King). He further testified that the administrative tool identified as Trade Secret 6 is "the main

3    part" of EchoSpan's system and that "it is the guts of the system" that "gives [users] all of the

4    options that they want." Id.  That Trade Secret 6 derives value from its secrecy is confirmed by the

5    great lengths Medallia's lead product designer went to in order to secure access to it and document

6    what she learned. Dkt. 431-3, Kapnadak Depo. II, 254:11-255:03, 165:11-166:13; Ex. 19.

7            The jury reasonably relied on this evidence in determining that, if not for its secrecy, Trade

8    Secret 6 would (and did) "afford competitors an economic advantage" and would "lose economic

9    value." *WWMAP, LLC*, 2024 WL 151411, at *3.  The  jury's conclusion that this element was met

10   should not be disturbed.

11   **III.    MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS**
            **JUDGMENT FOR THAT OF THE JURY ON DAMAGES.**
12

13           Medallia next attacks the jury's damages award to EchoSpan. Mot. at 13-18. But the Rule

14   50 standard dooms these arguments too, because substantial evidence supports the jury's decision.

15   As an initial matter, the O2 Micro and Versata cases do not support Medallia's claim that "[c]ourts

16   routinely grant trade-secret defendants judgment as a matter of law where, as here, the plaintiff

17   asserts multiple trade secrets." Mot. at 13. Instead, these cases stand only for the proposition that

18   assignment of value across multiple trade secrets must be supported by evidence from which the

19   jury can determine those amounts. That happened here. Unlike those cases, the jury's verdict here is

20   not "based only upon speculation or guesswork." Mot. at 14. Crediting EchoSpan's evidence and

21   disregarding all conflicting evidence, there is ample fact and admissible expert testimony showing

22   both the total amount of damages and that those damages can be appropriately apportioned to Trade

23   Secret 6.

24           **A.    Medallia's Head Start Is Supported by Evidence.**

25           Medallia's own documents demonstrate its head start benefit: building a 360-review product

26   would take substantially longer than was required by Bank of America and Medallia substantially

27   reduced that time by accessing EchoSpan's system. A 2021 email notes that the Bank was

28   demanding a ten month build and was "not expecting a potential 2 year delay." Ex. 69 at 2. The

12

same email projects that Medallia required an estimated 18-24 months for product delivery. Id. Medallia communications during this time frame echo the impossibility of building the products for Bank of America by early 2022. Ex. 36 (Medallia was "a million miles away" from a product), Ex. 38 (pace of development was "not sustainable"); Ex. 39 (Bank of America's timeline was "too aggressive"); Ex. 48 (if Medallia did not purchase EchoSpan, Medallia's "plan B" was to "[t]ake tequila shots until we forget").

Medallia's own documents further demonstrate the benefit to Medallia by entering the market. To begin, Medallia's contract with Bank of America generates ██████████ over four years, and the "lifetime value" of providing the Bank with a 360 system would "exceed . . . ██████ Dkt. 431-4, Luton Depo., 249:20; Dkt. 431-5, Cameron Depo., 252:12-18, 254:12-255:06. In addition to the revenue from Bank of America, Medallia also intends to enter the broader market with its 360-review system. Dkt. 431-4, Luton Depo. 255:17-24. An internal 2021 Medallia product analysis identifies this market's size at $2 billion and further projects that Medallia would generate exponential revenues up to nearly $20 million in the first years after entering that market. Ex. 23 at 2, 16 (projecting Medallia's revenue from 360 product at $1 million in year one, $3 million in year 2, $5 million in year three, and $8.5 million in year four); Tr. 399:12-16 (testifying that these projections were estimates of 360 sales) (Khanna). Medallia's former chief product officer testified that these projections were "what the revenue of the employee 360 product could bring us if we're able to cross-sell this." Tr. 368:1-22. The jury further heard testimony of the value of EchoSpan as a whole, Tr. 609:16-25 (Vance), which amount Medallia confirmed was a reasonable range, Dkt. 431-6, Cameron Depo. 266:24-267:20. Based on this evidence, the jury could have reasonably concluded that Medallia's obtained a substantial benefit from an accelerated entry into the market through its theft of EchoSpan's trade secrets—particularly in light of evidence that a head start was necessary to retaining Bank of America as a client. The jury did just that.

Beyond fact evidence, which is enough to support the jury's verdict, there was also ample expert testimony on damages submitted to the jury. EchoSpan's damages expert  calculated its unjust enrichment damages from Medallia's theft at $23.3 million. Tr. 790:9-12 (Ratner). He calculated the Bank of America revenue and profits that Medallia received, which he determined

1  amounted to $11,574,146. Tr. 740:5-7 (Ratner). This amount reflects the amount Medallia was able

2  to earn from Bank of America that it would not have been able to earn but for the misappropriation.

3  Tr. 739:6-740:7 (Ratner). He further calculated Medallia's head start benefit (the benefit of

4  accessing the market sooner than it would have been able to without the trade secret theft) at

5  $8,916,930 and saved costs (the labor costs associated with developing EchoSpan's system) at

6  $2,874,957. Tr. 727:20-729:19 . As to this accelerated profits from its theft, Mr. Ratner relied on

7  Medallia's own documents and projections to determine its profits in the marketplace from its 360

8  system and determined that Medallia's misappropriation would earn it an additional $2 million each

9  year, (Tr. 743:14-745:6), based on Medallia's market position, Medallia's $2 billion market size

10 estimate (Ex. 23 at 2), Medallia's own projection that it would grow from $1 million to $8.5 million

11 in revenue in 4 years, (Ex. 23 at 16), and market profitability estimates, (Tr. 744:14-750:11).  Mr.

12 Ratner also testified as to how he reached his conclusions about Medallia's $2,874,957 saved cost

13 benefit: he assessed the amount of engineering time spent developing EchoSpan's system at the rate

14 of EchoSpan's developer. Tr. 750:13-752:4 (Ratner). Mr. Ratner also testified that his damages

15 calculations were appropriate as they were in line with the value of the company as a whole, whose

16 primary value is its software. Tr. 752:23-754:16, 787:8-14 (Ratner). Mr. Ratner testified that none

17 of these forms of damages was connected to EchoSpan's retention of the Bank of America

18 relationship and were still available "even if the jury believes that EchoSpan was going to lose

19 Bank of America as a customer." Tr. 726:22-727:7; 767:25-768:10 ("Even if they were looking to

20 make a change. . . the trade secret statute allows the plaintiff to recover and disgorge those

21 profits."). This expert testimony was in addition to the fact evidence supporting the jury's verdict. It

22 is independently sufficient to support the total amount of the jury's award.

23        **B.    The Jury's Allocation Of Unjust Enrichment to Trade Secret 6 Was Supported
24               By Evidence.**

25        Medallia further claims that the jury's allocation of $11.7 in unjust enrichment to Trade

26 Secret 6 was speculative. Mot. at 13-18. Medallia is incorrect. The jury's award was supported at

27 trial, through both fact and expert testimony. Medallia's argument is the same as that raised, and

28 rejected, by the Sixth Circuit court in *Caudill Seed & Warehouse Co. See* 53 F.4th at 389-390

14

1   (rejecting argument that jury could not have reasonably awarded damages on misappropriation of a

2   single trade secret where "[plaintiff]'s expert assumed as part of his analysis that [plaintiff] would

3   recover on all six alleged trade secrets, [but], [t]he jury then found no misappropriation of Trade

4   Secrets 2 or 6."). Because the trial evidence supports the jury's allocation of damages, this Court

5   should, consistent with the Sixth Circuit's reasoning, reject Medallia's argument as well.

   **1.   Fact and Expert Testimony Supported The Jury's Allocation of
           Damages to Trade Secret 6.**

8        In *Caudill*, the Sixth Circuit held that even where the plaintiff's damages model assumed

9   misappropriation of all trade secrets, a jury may still reasonably determine the damages attributable

10  to a single trade secret when supplied the necessary information to do so. 53 F.4th at 389. There,

11  although the plaintiff's expert's damages model assumed appropriation of six trade secrets and the

12  plaintiff only proved damages attributable to one trade secret, the plaintiff also introduced

13  testimony that its claimed damages were all related to and driven by its Trade Secret 1. Id. The

14  Sixth Circuit rejected the defendant's Rule 50 argument that the jury's verdict could not rely on the

15  expert's damages model because, it found, the jury had sufficient evidence to apportion the

16  damages projected by the model to the successful trade secret.  *Id.* at 386, 389. ("[A]lthough

17  [plaintiff's] expert's damages model assumed misappropriation of all trade secrets, he testified that

18  all of [plainitff's] research and development expenses went to broccoli seed research. That allowed

19  the jury to calculate the value of Trade Secret 1 even while finding no misappropriation of Trade

20  Secrets 2 and 6."). A Northern District of California court has similarly held that where there is

21  evidence from which the jury can determine damages attributable to those trade secrets they find

22  misappropriated, absolute mathematical precision in apportioning those damages is not required.

23  Instead, as recognized in *ATS Products Inc. v. Ghiorso*, where the jury's verdict apportioning losses

24  to the seven (of thirteen) trade secrets was supported by evidence, there was no grounds to disturb

25  that verdict. No. C10-4880 BZ, 2012 WL 253315, at *1 (N.D. Cal. Jan. 26, 2012) (noting that trade

26  secret damages "need not be calculated with mathematical precision" there must only be a

27  "reasonable basis for computing the loss").

28

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

Trade Secret 6 was the "core" of the system. Like the plaintiffs in Caudill and ATS Products EchoSpan offered evidence from which the jury could determine the damages attributable to Trade Secret 6. First, Medallia's own expert confirmed the methodology applied by the jury in Caudill: where a single trade secret drives the bulk of the damages, here the value of the software system, then it is appropriate to attribute the majority of the damages to that trade secret. Specifically, Ms. Irwin testified that trade secret damages need not be apportioned if they are inseparable but may be apportioned if the trade secrets are separable. Tr. 1055:24-1056:5, 1056:12-23. She further testified that the value among trade secrets is not, as Medallia now argues, necessarily equal among those trade secrets but that there may be a technical determination that one trade secret may drive the operability of software:

> Q: If you had a single trade secret in a bundle. . . , without which the entire software program would not work, that would be relevant to both a determination of value and separability, wouldn't it?"
>
> A: . . . If the absence of a single feature means that all of the other features can't function, I think technically that would be true.

*Id.* at 1059:14-23 (Irwin). She further confirmed that both the severability of trade secrets and the determination of a value driver of those trade secrets as the part of a whole is a technical determination, not a question for a damages expert. *Id.* at 1056:20-22, 1057:6-7, 1058:16-21, 1058:24-1059:11 (Irwin). To make that determination, she specifically approved the testimony offered here: the owner of a technology company is equipped to provide evidence of the technical separability of the trade secrets. *Id.* 1059:6-11 ("I would assume that the owner of the company would—could do that."). EchoSpan's damages expert echoed this testimony as well: technology may have a value driver, i.e., the primary driver of value for that technology. Tr. 1100:25-1101:12.

Moreover, just as the plaintiff in *Caudill* offered that "all of manufacturer's [claimed damages of] research and development expenses went to broccoli seed research," the subject matter of the successful trade secret claim, 53 F.4th at 389, EchoSpan offered extensive testimony that Trade Secret 6 controls the operability of the remaining features of EchoSpan's system. Tr. 1072:15-25. The jury heard testimony that the capability of Trade Secret 6 "is the core[;] it enables everything. All of the other [functions] are attached to it." 1073:15-1074:6 (Vance). Without Trade

Secret 6, "the rest of the features of the system would not work." 1072:15-25 (Vance); Tr. 915:21-23 (King) (testifying that the capabilities of these settings drive the functionality of EchoSpan system), 1079:13-15 (Vance). As Mr. Vance describe it, "You can think of the admin tool as like the head of the octopus and everything else are the tentacles." 1074:2-6 (Vance). Trade Secret 6 "is the hub and all of the other components rely on it to do their jobs." Tr. 1078:9-13 (Vance). The rest of the tool would not work absent Trade Secret 6. Tr. 1078:14-20 (Vance) (Q: "So in the absence of trade secret number 6 and the functions associated with it, can the other features of the system work at all? A. They cannot."). Technologically, "it's the key that unlocks everything." Tr. 1078:21-23, 1079:10-12 (Vance). EchoSpan's lead developer echoed the importance of Trade Secret 6 in driving the value of EchoSpan's system: "The admin tool is what makes everything work," without it, "there's nothing that EchoSpan can deliver." Tr. 913:13-914:5 (King). He further testified that the administrative tool identified as Trade Secret 6 is "the main part" of EchoSpan's system and that "it is the guts of the system" that "gives [users] all of the options that they want." Id.

As its core, Trade Secret 6 drives the value of the system. Because Trade Secret 6 is critical to the functionality of the system, the evidence showed that Trade Secret 6 drives the commercial value of the system. Tr. 1078:24-1079:7, 1080:13-17 (Vance). Although Medallia claims that the mere premise that one part of a system is necessary for the remainder of the system to function is not sufficient to establish its value, Mot. at 17, it ignores the evidence presented on this point. The jury heard testimony that the remainder of the system is valueless without Trade Secret 6: EchoSpan cannot sell or license any function of its system without the administrative portion defined as Trade Secret 6. 1074:13-1075:15 (Vance). "It's kind of like tires on a car, right? You take the tires off your car, they do have independent value, but they just don't do anything." Tr. 1079:5-7 (Vance). Even if other capabilities have intrinsic value to EchoSpan customers, "the bottom line is that none of those features have any capability at all without Trade Secret 6 grounding them." Tr. 1086:11-25 (Vance). Accordingly, without Trade Secret 6, the evidence, which Medallia conspicuously fails to consider, Mot. at 17, establishes that the value of the inert system would be "close to zero." Tr. 1079:23-1080:3. Rather than testimony concerning only the "assessment of importance" of Trade Secret 6, (which the court found insufficient in O2 Micro) this

17

testimony that the value of the remaining trade secrets in an inert system would be "close to zero." Tr. 1079:23-1080:3, provided the jury grounds to assign the entire value of the system to Trade Secret 6. As in Caudill, this testimony "allow[ed the] jury to calculate the value of misappropriation of one trade secret, even while finding no misappropriation of the others." *Id.* at 393 (applying same reasoning to award of unjust enrichment damages).

### 2. Apportionment Is Not Required To Determine Enrichment From Misappropriation Of Unified Systems.

Medallia's argument should be rejected for the additional reason that Mr. Ratner opined that, because EchoSpan's multiple trade secrets encompassed parts of a unified system, his damages model would still apply even if EchoSpan did not prevail on all of its trade secrets. Specifically, Mr. Ratner testified that an analysis of the value of each claimed trade secret is not appropriate here, where the technology operates interdependently and is part of a unified structure. Tr. 1099:23-110011, 1105:1-10, 1105:17-1106:1.  Because the software functions together, he testified, the unjust enrichment flows from the success of any trade secret claims: "You don't have to go pro rata. . . It would be just the balance would go to the [successful] trade secrets." *Id.* 1103:22-24 (a finding that one or more claimed trade secrets was not a trade secret "wouldn't change the damages.").

Mr. Ratner's testimony is supported by law. Apportionment is not necessary where multiple trade secrets encompass "parts of a unified structure," like EchoSpan's system.  *BladeRoom Grp. Ltd. v. Emerson Elec. Co*., 331 F. Supp. 3d 977, 989 (N.D. Cal. 2018), vacated on other grounds, 20 F.4th 1231 (9th Cir. 2021). This is because "the misappropriation of any of the asserted trade secrets [from a unified structure] would have caused all of the damages it sought." *Id.; see also Neural Magic, Inc. v. Meta Platforms, Inc*., 659 F. Supp. 3d 138, 193 (D. Mass. 2023) (rejecting argument that expert opinion should be excluded for failure to apportion where expert testified that defendant received benefit from use of less than all trade); *Monster Energy Co. v. Vital Pharms., Inc*., No. EDCV181882JGBSHKX, 2022 WL 17218077, at *19 (C.D. Cal. Aug. 2, 2022) (rejecting argument that damages expert failed to apportion damages to individual trade secrets because "he was not required to do so where Monster's theory is that misappropriation of any one of the [alleged] trade secrets caused [Defendants' unjust enrichment]."). Accordingly, Medallia's

1    argument should be rejected for the additional reason that Mr. Ratner "made clear that his analysis

2    is still applicable to less than all the trade secrets." *Neural Magic, Inc.*, 659 F. Supp. at 193.

3         Because of the evidence EchoSpan offered, neither *O2 Micro* nor *Versata* are applicable or

4    persuasive here. In *O2 Micro*, there was no evidence from which a jury had a reasonable basis to

5    determine the relative value among the eleven alleged trade secrets. *02 Micro Int'l Ltd. v.

6    Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076-1077 (N.D. Cal. 2005). The jury was not

7    offered any way to attribute value to each individual trade secret—nor was there evidence, as here,

8    that one trade secret was the "core" of a unified system.  Id.  And the evidence in *Versata* "did not

9    give the jury the tools" to determine the relative benefit from each of several trade secrets.  *Versata

10   Software, Inc. v. Ford Motor Co.*, No. 15-11264, 2023 WL 3175427, at *16 (E.D. Mich. May 1,

11   2023), modified, No. 15-CV-10628, 2023 WL 8622001 (E.D. Mich. June 8, 2023). Not so here,

12   where—instead—the jury had fact and expert testimony from which to evaluate the value

13   attributable to Trade Secret 6. This action is significantly more analogous to *Caudill Seed &

14   Warehouse Co.*, which rejected the same argument Medallia raises here.

### 3.    Medallia's Argument That Trade Secret 6 Must Control Other Trade Secrets Is Incorrect.

17        Lastly, Medallia's claim that because the functions that Trade Secret 6 controls were not

18   found to trade secrets themselves, Trade Secret 6 cannot have independent value, Mot. at 18,  is

19   absurd. A trade secret's value is derived from not being known or ascertainable by others who can

20   obtain economic value from the use of the information, not from its control of other trade secrets.

21   18 U.S.C. § 1839(3)(B). Google's search algorithm is a trade secret, and it is not any less so

22   because the results it generates are not trade secrets or because it publishes those results on a

23   webpage that is not a trade secret. The evidence at trial demonstrated that Trade Secret 6 had value,

24   not because it unlocked other trade secrets, but because it controlled the entire the system (whether

25   the remainder of the system consisted of trade secrets or not). Tr. 1075:1-15 (EchoSpan could not

26   sell component parts of system without Trade Secret 6).

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

**IV.  MEDALLIA IMPROPERLY ASKS THE COURT TO SUBSTITUTE ITS JUDGMENT FOR THAT OF THE JURY ON THE EXTENT OF MEDALLIA'S UNJUST ENRICHMENT.**

**A.  Evidence Supports the Conclusion That Medallia Was Unjustly Enriched By Its Misappropriation.**

Medallia further claims that there was no evidence it was unjustly enriched by its misappropriation of Trade Secret 6. Mot. at 19.  Once again omitting all evidence in support of the verdict, Medallia claims that "the record fails to support . . .  any head start benefit." Mot. at 19.

As noted, Medallia's own documents and testimony show both the necessity of access to EchoSpan's system and the benefit it gained from it. The evidence at trial established that Medallia could not build the product that Bank of America requested on any reasonable time frame. *See infra* at 25. So, the evidence further established, it turned to EchoSpan: a Medallia vice president directed its lead product manager on this product to access a trial of EchoSpan's system and further directed her to do so to "get as much as [she could] out of this trial account.". Dkt. 431-3, Kapnadak Depo., 74:08-76:14; 32:02-32:09, 34:01-34:17, 24:19-25:02. *Id.* 157:06-157:10. And this was necessary because Bank of America was Medallia's largest client, and Medallia did not have a product with 360 functionalities at that time or the internal experience to create one. Dkt. 431-3, Kapnadak Depo. 39:17-41:04. Medallia's lead product manager testified that "understand[ing] the EchoSpan functionality" would "assist[]" her in meeting the Bank's requirements." Dkt. 431-3, Kapnadak Depo. 71:01-05. The sheer amount that its product developers accessed EchoSpan's trial supports that they were benefitting from it. Tr. 515:17-18 (testifying that Medallia's logins were "excessive").

Medallia also claims that it could not have been unjustly enriched by its misappropriation because it has delayed its entry into the market. Mot. at 19. Unlike the cases it cites, Mot. at 19-20, Medallia has developed and launched a 360-review system. Dkt. 431-4, Luton Depo. 255:20-22 (Medallia's 360 system "just launched").  It cannot avoid damages for its head by delaying its entry into the broader market; in such a circumstance, the wrongdoer cannot avoid the consequences of its wrongdoing by "not going . . . on a marketing binge. . . during [a] lawsuit." Tr. 770:13-771:5 (Ratner).

Finally, Medallia's claim that EchoSpan's expert did not assess Medallia's incorporation of the settings it stole from EchoSpan, Mot. at 20, as part of Trade Secret 6 is both irrelevant and simply incorrect. Mr. Myers did assess the use of these settings. Compare Tr. 661:12-16 (describing that both EchoSpan and Medallia permit administrators to set minimum number of reviews per rater group) with Ex. 19, Row 43 (describing same setting); compare Tr. 662:5-10 (describing that both EchoSpan and Medallia contain setting that permits administrators to set minimum number of raters in a particular group) with Ex. 19, Row 40 (describing same setting). And in any event, his assessment is not necessary when the fact evidence establishes the substantial benefit Medallia received as a result of access to, and use, of Trade Secret 6.

**B.      The Evidence Supports the Amount of Unjust Enrichment Awarded.**

Medallia further claims that, even if it benefitted from misappropriating EchoSpan's Trade Secret 6, it should not have to compensate EchoSpan because the amount of that enrichment is not supported. Mot. at 20. EchoSpan is required only to prove its damages to a reasonable estimate based on a rational model, not mathematical precision. *Alifax Holding Spa v. Alcor Sci. Inc.*, 404 F. Supp. 3d 552, 574 (D.R.I. 2019) (finding damages model reasonable). And, once again, Medallia simply ignores substantial evidence presented to the jury.

Medallia attempts to recharacterize the length of time it would take to enter the market as relating only to performance management, which is claims is "a completely separate tool." Mot. at 21. But that is not what the evidence at trial established: Medallia's own former chief product officer confirmed that "performance management" described the system Medallia was building for the Bank—that is, the entirety of the tool that Medallia relied on access to EchoSpan to deliver. Tr. 366:7-8. She confirmed this in her testimony that the $2 billion market size was for "performance management," which was what Medallia was "trying to build for the Bank." Tr. 366:12-18 (Khanna) ("Q: Medallia believed the market size for this performance management component of the product to be $2 billion; right? A. Yes."). Mr. Myers also testified that he analyzed the record and the systems and determined "whether . . . Medallia gained a head start in building a competing product." Tr. 639:18-22; 664:4-15. Ultimately, he opined in the affirmative that Medallia gained a "material head start" by accessing EchoSpan's trial. Id. And Mr. Ratner quantified this head start

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

1  based on methodologies he described to the jury. Supra at 15. The remaining arguments that

2  Medallia makes (Mot. at 20-22), concerning the projected length of the head start and the efforts

3  attributable to writing source code for the misappropriated trade secret, were issues of fact raised at

4  trial and considered and rejected by the jury. Tr. 772:22-774:15, 782:11-783:4. None of this

5  testimony outweighs the substantial evidence as to the amount of the unjust enrichment Medallia

6  received. Medallia's criticism of the head start benefit is nothing more than a criticism of how the

7  jury weighed the evidence. That Medallia disagrees with the jury's findings of fact is no basis to

8  grant its Motion.

9        **C.      There Is Overwhelming Evidence Of Medallia's Willful And Malicious**
          **Misappropriation and Willful, Wanton, or Grossly Negligent Breach of the**
10        **Terms and Conditions.**

11        Medallia separately claims that its access to and taking of EchoSpan's information was

12  merely an "oversight," and falsely claims that "there is no evidence that . . . Medallia intended to

13  harm EchoSpan" or that "Medallia was grossly negligent." Mot. at 22-23. But, the Court has

14  already ruled that, "a reasonable jury could find Medallia acted willfully or wantonly based on the

15  evidence in the record." Dkt. 378 at 8. This ruling alone is sufficient to reject Medallia's arguments

16  that EchoSpan is not entitled to exemplary damages and that the exculpatory clause of the Terms

17  and Conditions applies to Medallia's conduct.

18        Not only did the evidence at trial support the jury's conclusions, but the jury also

19  specifically found by clear and convincing evidence that Medallia's actions were "willful and

20  malicious" in misappropriating EchoSpan's trade secret. Dkt. 389 at 9 (answering in the affirmative

21  that the jury determined "by clear and convincing evidence that Medallia's improper acquisition or

22  use of EchoSpan's trade secret(s) was willful and malicious"); 18 U.S.C. § 1836(b)(3)(C);

23  O.C.G.A. § 10-1-763(c) (requiring willful or malicious conduct to award exemplary damages). And

24  the same conduct supports the jury's finding that Medallia breach of the Terms and Conditions was

25  willful, wanton, or grossly negligent.   Dkt. 389 at 9 (answering in the affirmative that "Medallia's

26  breach [was] willful or wanton or grossly negligen[t].").

27        The jury's conclusion was based on ample evidence, both direct and circumstantial. The

28  product manager who created the trial access testified by deposition about her concern in creating a

1  trial account. She sought, and obtained, explicit approval from a Medallia vice president before

2  creating the trial access to EchoSpan's system because she "didn't want Medallia to later say [she]

3  shouldn't have . . . sought out access to the trial account." Dkt. 431-3, Kapnadak Depo. II, 76:06-

4  76:14, 96:22-97:02 ("Q. [Y]ou were told to access the trial account by your boss, right? A. That's

5  correct."), 122:03-122:07. She was not the only person who thought her use of EchoSpan's trial was

6  dubious. The Medallia vice president consulted with two other Medallia executives and before

7  subsequently confirming the instruction to access a trial account. Ex. 45. The product manager

8  testified that she was "glad to have found that [her supervisor] had confirmed [his approval] in

9  writing" because of her concern that the company would later claim she was acting without

10  authority. *Id.* 77:07-77:20. A screenshot of this approval is the only document she took with her

11  when she left Medallia. Dkt. 431-2, Kapnadak Depo. I, 189:14-189:22.

12       The jury considered Medallia's chief product officer's concern about the trial account: this

13  c-suite executive called the product manager on her cell phone, which was unusual, to inquire about

14  the trial account but distanced herself from the trial access saying that she "didn't want to have

15  anything to do with it;" she "said she did not want access [and] she did not want [the product

16  manager] forwarding any e-mails to her." Dkt. 431-3, Kapnadak Depo. II, 78:10-85:03, 23:02-

17  23:17, 86:11-87:11, 86:22-87:18. This "set off red flags" with the product manager because it

18  indicated that "what was done was perhaps not correct or rightfully done" and that the chief product

19  officer "didn't want to be involved in it." *Id.* 23:11-24:18. The jury could have reasonably

20  concluded from this evidence that these Medallia employees acted, at a minimum, willfully and

21  with gross negligence.

22       Further, Medallia's desperation to secure this "critical" project and satisfy its largest

23  customer at all costs was also evident at trial. Tr. 347:17-21 (Khanna). Bank of America was

24  Medallia's largest client (approximately one and a half times its next largest customer) and had

25  been for four years. Dkt. 431-4, Luton Depo. 17:03-18:04. Moreover, as Medallia was attempting to

26  secure this business from Bank of America, it was simultaneously positioning itself for acquisition

27  by the private equity firm Thoma Bravo for $6.4 billion. Tr. 345:3-346:16 (Khanna). The Bank's

28  requirements, though, were beyond Medallia's capabilities in the time frame the Bank required.

1   Dkt. 431-3, Kapnadak Depo. II, 210:13-211:03 (agreeing that "there's no way we will launch

2   something in January that will be satisfactory."); Dkt. 431-2, Kapnadak Depo. I, 113:07-113:12

3   (admitting that she accessed EchoSpan "to understand the functionality because, as I said, I did not

4   have experience in 360 product at all, so I did not understand their requirements or how it had to be

5   built or any of that."). Medallia's senior executives determined that they were "a million miles

6   away" from being able to satisfy the Bank's 360 requirements which were on "too aggressive of a

7   timeline" to meet. Tr. 337:1-12, 389:19-340:1, 393:17-394:3 (Khanna). And, prior to accessing

8   EchoSpan's system, the lead product manager informed her superior she could not develop the

9   product due to her lack of experience, Dkt. 431-3, Kapnadak Depo. II, 254:11-255:03 ("I'm not an

10  expert in this. . . .  I don't think I can do this, and I don't think we can build this based on the

11  information."), and her team's efforts to do so were "not sustainable" because of the lack of support

12  from senior leaders. Dkt. 381-3, Kapnadak Depo. II, 225:03-226:11; Ex. 38 at 4.

13          The evidence demonstrated that the difficulty of development, together with Medallia's

14  desperation to meet the Bank's demands led Medallia to EchoSpan, including: accessing

15  EchoSpan's free trial, disseminating that access trial to the 360 product development team and

16  encouraging them to use it, Dkt. 431-3, Kapnadak Depo. II, 134:10-135:09 ("I think that the team

17  that was working on it could benefit from looking at it."), 136:15-16, (sharing login credentials to

18  EchoSpan system); Ex. 37 ("I added you as an admin to EchoSpan."); exercising the system to

19  understand the functionality of the tool and "see[] how the whole process works" and documenting

20  those findings, Dkt. 431-3, Kapnadak Depo. II, 159:13-17, 160:03-10, 161:05-161:17 ("Q: You

21  wanted to take the screenshots is so that you would have the ability to access some of this

22  information after you lost the trial account access, correct? A. Yes."), 169:08-169:15; Tr. 253:17-

23  254:3, Ex. 26 (screenshots of EchoSpan's system); Ex. 46 ("I . . . took a bunch of screenshots"); Tr.

24  378:14-21); documenting the settings within Trade Secret 6 and determining the priority of those

25  settings, Ex. 19; Dkt. 431-3, Kapnadak Depo. II, 165:11-166:13; Tr. 371:15-21 (Khanna); 1076:2-

26  17, 10771-6 (Vance) (columns A, B, and C in Exhibit 19 reflects "a replication" of "the advanced

27  setting page in the administrative tool" of Trade Secret 6).

28

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC

1      In addition, in its desperation to satisfy Bank of America's demand, Medallia entered into

2  acquisition discussions with EchoSpan but intentionally concealed from EchoSpan that it was doing

3  so to provide those 360 review capabilities to the Bank. Dkt. 431-3, Kapnadak Depo. II, 227:15-

4  228:02 ("Q. Okay. In fact, you thought EchoSpan was -- and its product was a good option to

5  consider for an acquisition, right? A. Yes."); Tr. 341:22-342:4 (Khanna) (customer retention at risk

6  with acquisition other than EchoSpan); Medallia Tr. 427:5-9; 891:22-892:6; Ex. 22 ("BAC has

7  NOT told Echospan yet. . . we obviously don't want that to come from us.").

8      Contrary to Medallia's representation that there was "no evidence" of its wrongful conduct,

9  there was "clear and convincing" evidence to support the conclusion the Medallia's conduct met the

10  culpability standards and no ground to reverse the jury's award.

11  **V.    THE JURY'S EXEMPLARY DAMAGES AWARD IS APPROPRIATE.**

12      Beyond improperly ignoring evidence of the willful and malicious misconduct (supra,

13  Section IV.C), Medallia's objection to the exemplary damages award,  Mot. at 25, is just a rehash of

14  arguments Medallia has already lost twice. See Dkts. 271, 416. The Court has already denied

15  Medallia's motion requesting that the Court independently determine exemplary damages and

16  addressed the propriety of the jury determining exemplary damages. Dkt. 437. And both the Court's

17  instructions to the jury, Dkt. 385, Instruction 26, and the law which permits exemplary damages of

18  twice the award of actual damages, see 18 U.S.C. § 1836(b)(3)(C); O.C.G.A. § 10-1-763(b), deem

19  this amount of exemplary damages entirely appropriate.

20  **VI.    MEDALLIA IS NOT ENTITLED TO A NEW TRIAL OR REMITTITUR.**

21      As a final Hail Mary, Medallia argues that the Court should find the jury's unjust

22  enrichment and exemplary damages awards "excessive," and either order a new trial on damages or

23  impose a remittitur of one-tenth to one-twentieth of the jury's actual award. As with the rest of

24  Medallia's Motion, these arguments do not withstand scrutiny.

25      Where a party seeks a new trial based on the amount of a jury's damages award, the court

26  must "allow substantial deference to a jury's finding of the appropriate amount of damages." *Del*

27  *Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996), aff'd, 526

28  U.S. 687.  Rule 59 is not the proper vehicle for merely challenging the sufficiency of the evidence,

1   a Rule 50(b) motion is the only proper way to assert such a challenge. *Unitherm Food Sys., Inc. v.*

2   *Swift-Eckrich, Inc*., 546 U.S. 394, 400 (2006).  As Medallia's own authority states, "[w]hen the

3   court, after viewing the evidence concerning damages in a light most favorable to the prevailing

4   party, determines that the damages award is excessive, it has two alternatives. It may grant

5   defendant's motion for a new trial or deny the motion conditional upon the prevailing party

6   accepting a remittitur." *Fenner v. Dependable Trucking Co., Inc*., 716 F.2d 598, 603 (9th Cir. 1983)

7   (italics added); see Mot. 25 (citing id.).

8         **A.**    **The Unjust Enrichment Award Is Not Excessive**

9         First, Medallia's cursory, twelve-line argument that the jury's unjust enrichment award was

10   excessive merely incorporates by reference Medallia's misguided Rule 50(b) arguments regarding

11   apportionment, see Mot. at 26 (referencing "Part II" of Medallia's brief), and should be rejected for

12   the same reason:  Ample evidence supports the jury's damages verdict.  *See supra* Section IV.C

13   (detailing extensive trial evidence supporting the jury's damages award).

14         **B.**    **The Exemplary Damages Award Is Not Excessive**

15         Next, although the DTSA and GTSA both explicitly permit exemplary damages of up to

16   twice the amount of unjust enrichment damages, Medallia argues that the jury's exemplary damages

17   award here—only 1.2 times greater than its unjust enrichment award—was so "grossly excessive"

18   that it violates the Due Process Clause of the Fifth Amendment and must be thrown out. Medallia

19   has no support for this wild demand, which represents just the latest attempt to take the issue of

20   exemplary damages away from the jury.

21         Medallia stretches in applying the standard set by the Supreme Court in *State Farm Mut.*

22   *Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), because the whole purpose of constitutional limits

23   on common law punitive damages "is that '[e]lementary notions of fairness enshrined in our

24   constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will

25   subject him to punishment, but also of the severity of the penalty that a State may impose.'" *Id.* at

26   417. Both the DTSA and GTSA explicitly give such notice: expressly permit exemplary damages of

27   up to twice the damages in cases where trade secrets were "willfully and maliciously

28   misappropriated"—a factual finding the jury definitively made. It does not make sense to graft the

1 State Farm standard onto these statutorily prescribed remedies. That mismatch explains why

2 Medallia fails to cite a single trade secret case from within the Ninth Circuit or from any other

3 jurisdiction in which an award of exemplary was found so unconstitutionally "excessive" under

4 State Farm as to warrant a new trial on damages. Indeed, Medallia cites only a single trade secret

5 case in which a court has even analyzed exemplary damages under the State Farm standard—the

6 S.D.N.Y. decision in the titanic case of *Syntel Sterling Best Shores Mauritius Limited. v. TriZetto*

7 *Group, Incorporated*. See Mot. at 26. There, the court applied the State Farm analysis while relying

8 on federal common law to remit a jury award of over half a billion dollars in exemplary damages to

9 only $284 million in exemplary damages. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto*

10 *Grp., Inc*., No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *11 (S.D.N.Y. Apr. 20, 2021)

11 (subsequent history omitted). This case could not be more different.

12         Even assuming, arguendo, that State Farm provides the proper lens for evaluating an

13 exemplary award, all three of the State Farm factors—(1) the reprehensibility of Medallia's

14 conduct, (2) the ratio of "punitive" to normal damages, and (3) comparable civil penalties—all

15 weigh heavily in favor of the reasonableness of the jury's award here.

16         ***Reprehensibility***. To consider the first State Farm factor the Court need look no further than

17 the jury's factual finding that Medallia acted with "willful and malicious" intent.  For its part,

18 Medallia misapplies State Farm's reprehensibility analysis in an artificial and absurd manner that

19 would seem to preclude an award of exemplary damages in any trade secret case. To start with,

20 Medallia suggests that exemplary damages are excessive and improper here because Medallia was

21 found liable for only "economic wrongdoing, not physical harm" and because EchoSpan is "a

22 multimillion dollar corporation" and not "among the financially vulnerable, i.e. 'the elderly, the

23 poor, and other consumers . . . most vulnerable to trickery or deceit.'" Mot. at 27. EchoSpan

24 respectfully submits that the inclusion of exemplary damages provisions in these trade secret

25 statutes would be effectively meaningless if such damages were available only where trade secret

26 misappropriation involved physical violence against the poor and elderly.

27         Medallia's remaining arguments are nothing more than a blatant attempt to retry the facts of

28 this case and ignore the jury's verdict on liability and its explicit determination that Medallia's

27

1   misappropriation of EchoSpan's trade secrets "was willful and malicious." Dkt. 389 at 9, Question

2   52. Contrary to Medallia's self-serving characterizations, the trial record plainly demonstrates that

3   Medallia's conduct was reprehensible. See supra, Section IV.C.

4        ***Ratio***. The 1.2:1 ratio of exemplary to regular damages here further supports the

5   reasonableness of the jury's award—particularly where the DTSA and GTSA expressly provide for

6   exemplary awards of up to double regular damages. Medallia argues that no exemplary damages are

7   available here as a matter of law because the jury awarded unjust enrichment instead of lost profit

8   damages and, "[w]ithout any showing of actual harm, EchoSpan is not entitled to any award of

9   exemplary damages." Mot. at 28. But this claim is incompatible with the plain language of the

10  DTSA and GTSA, as well as the cases Medallia cites in its Motion. DTSA Section 1836 permits an

11  award of "exemplary damages in an amount not more than 2 times the amount of the damages

12  awarded under subparagraph (B)." 18 U.S.C. § 1836(b)(3). That "subparagraph (B)" explicitly

13  permits damages for " "any unjust enrichment." Id. Courts have interpreted this language to mean

14  that exemplary damages may be double any type of damage awarded, "regardless of which one."

15  *Syntel Sterling*, 2021 WL 1553926, at *10; *see also Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d

16  950, 955 (C.D. Cal. 2011) (finding "no precedent that prohibits the doubling" of an $85 million

17  unjust enrichment award). That the jury chose to award damages for unjust enrichment has no

18  bearing on the availability of exemplary damages. Indeed, the jury could have awarded up to $23.4

19  million in purely exemplary damages under both the DTSA and GTSA. Instead, the jury chose to

20  award less than 60% of that amount. The jury's restraint undercuts any claim that its award was

21  "excessive."

22        Comparable Civil Penalties. The availability of up to a 2:1 ratio of exemplary to regular

23  damages under the DTSA and GTSA strongly suggests that the jury's decision to award only

24  slightly more than a 1:1 ratio of such damages was reasonable.

25        **C.     There Are No Grounds For Remittitur**

26        Medallia argues that even if the jury's damages award was not unconstitutionally

27  "excessive" under State Farm and does not warrant a new trial, the Court should nevertheless remit

28  that award to one-tenth or one-twentieth of what the jury actually awarded. These remittitur

1  arguments are nothing more than a repackaging of the same apportionment and "excessive" award

2  arguments made elsewhere in Medallia's Motion. See Mot. at 30. The Court should reject these

3  arguments once again, for the same reasons.

4  **<u>CONCLUSION</u>**

5  Medallia's Motion should be denied in its entirety.

6

7  Dated: April 1, 2024              COUNCILL, GUNNEMANN & CHALLY, LLC

8                                                By: *<u>/s/ Jonathan R. Chally</u>*
                                                        Jonathan R. Chally (GA Bar No.141392)
9                                                       (*Pro Hac Vice*)
                                                        Jennifer R. Virostko (GA Bar No. 959286)
10                                                      (*Pro Hac Vice*)
                                                        Joshua P. Gunnemann (GA Bar No. 152250)
11                                                      (*Pro Hac Vice*)

12                                               LEWIS & LLEWELLYN LLP

13                                                      Evangeline A.Z. Burbidge (CA Bar No. 266966)
                                                        Zachary C. Flood (CA Bar No. 313616)
14
                                                 *Attorneys for Plaintiff/Counter-Defendant EchoSpan, Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 5:22-cv-01732-NC